[L. A. No. 5854. Department One.—June 5, 1919.]

In the Matter of the Estate of CORNELIUS WALKER, Deceased. MABEL A. NASON, Appellant, v. MABEL E. WALKER, Guardian, etc., Respondent.

[1] PARENT AND CHILD — PRESUMPTION OF LEGITIMACY — REBUTTAL.— The presumption under section 194 of the Civil Code that a child born within ten months after the dissolution of the marriage of the mother is legitimate can be overcome only by proper and sufficient evidence showing that the husband was impotent, or that he was entirely absent from his wife during the period when the child must have been begotten, or that he was present with his wife only under such circumstances as afford clear and satisfactory proof that there was no sexual intercourse.

[2] ESTATES OF DECEASED PERSONS — CONTEST OF HEIRSHIP — LEGITIMACY OF CHILDREN—IMPOTENCY OF HUSBAND—INSTRUCTION.—In a contest on final distribution of an estate involving the legitimacy of twin children born to the surviving wife of the deceased after his death, the refusal to give concise and specific instruction that if the jury found the deceased impotent their verdict should be against such children, was not prejudicial error, where the issue was covered in given instructions, although not so clearly and definitely stated, and the jury could not fail to understand both the issue and its effect.

[3] OPPORTUNITY FOR INTERCOURSE.—The fact that the husband and wife, although separated, met and had opportunity for intercourse, is not conclusive as to the legitimacy of children born to the wife, and evidence of the relations and feelings between the parties is admissible to rebut any inference that they had intercourse when they met.

[4] PARENT AND CHILD—REBUTTAL OF LEGITIMACY OF CHILDREN—TRUE RULE.—If it is possible by the laws of nature for the husband to be the father (that is, if there was coition and no impotency),

no inquiry will be permitted into the probabilites of the case one way or the other, but the presumption of legitimacy is conclusive; and, on the other hand, it is always permissible to show that it was not possible by the laws of nature for the husband to be the father, as by showing impotency on his part, want of intercourse during the possible period of conception, or that the child is of a race or color such that it could not have been conceived by the husband.

[5] Id.—Impossibility of Paternity—Evidence.—The fact that it was not possible by the laws of nature for the husband to be the father, where that fact is in issue, is to be inquired into in the same manner as any other fact which is the subject of judicial inquiry, and any competent evidence relevant to the question is admissible as in other cases, it being the rule, however, in California, that neither the husband nor the wife is competent to testify to lack of intercourse.

[6] Id.—Degree of Proof.—The rule that the presumption of legitimacy is conclusive if it were possible by the laws of nature for the husband to be the father does not require that the proof of the fact of such impossibility must itself be beyond possibility of doubt.

[7] Estates of Deceased Persons — Contest of Heirship — Legitimacy of Children—Evidence—Want of Opportunity for Intercourse.—In a contest upon the final distribution of an estate involving the legitimacy of twin children born to a married woman, the court properly refused to confine the evidence of illegitimacy to a showing that the mother and her husband met only under circumstances which did not afford an opportunity for intercourse.

[8] Id.—Evidence of Birth of Prior Illegitimate Child—Effect of Former Contrary Decision—Law of Case.—Evidence merely that the wife had given birth to a prior illegitimate child is inadmissible, but evidence of such fact, when coupled with evidence that the husband knew of the fact, is admissible where husband and wife have separated but have met from time to time, for the purpose of showing the relationship and feeling between them, and rebutting any inference that intercourse took place between them on the occasions when they met. In the present case, however, the rejection of such evidence was not error, in view of the ruling on the previous appeal that it should be rejected, which ruling became the law of the case.

[9] Id.—Parentage of Children—Construction—Evidence.—In such a contest, a refusal to permit evidence of intercourse by the wife with another than her husband was correct, since the evidence was properly confined to proving nonintercourse with the husband, and on that issue evidence of relations by the wife with others was wholly immaterial. A refusal at the same time to instruct the jury that it was not necessary to find who was the father of the children, if the mother's husband was not, was not prejudicial, since

the jury were explicitly instructed that the only question they were to determine was whether or not the children were the children of their mother's husband, and the jury could not have been misled into conceiving it to be their duty to find the husband to be the father unless they could determine the identity of the man who was.

[10] ID.—REBUTTAL OF PRESUMPTION OF LEGITIMACY—DEGREE OF PROOF —INSTRUCTION.—An instruction that the presumption of legitimacy can be overcome only by clear and satisfactory proof is a correct statement of the law.

[11] ID.—INTERLOCUTORY DECREE OF DIVORCE—EFFECT OF—ERRONEOUS INSTRUCTION.—In such a contest, an instruction that the interlocutory decree of divorce which was admitted was entitled to little weight was error, as being an instruction as to the weight of the evidence, but the error was without prejudice in view of the other instructions given.

APPEAL from a decree of distribution of the Superior Court of Los Angeles County. Paul J. McCormick, Judge. Affirmed.

The facts are stated in the opinion of the court.

Geo. M. Harker for Appellant.

Schmidt & Riggins for Respondent.

OLNEY, J.—The decedent, Cornelius Walker, died intestate November 20, 1913. He left surviving him as his only heirs, then in being, his wife, Mabel E. Walker, and a daughter by a previous marriage, Mabel A. Nason. A few months before his death, that is, on July 3, 1913, he had secured an interlocutory decree of divorce from his wife on the ground of desertion. He had also made a property settlement with her whereby she released any interest in his estate, with the result that on his death his daughter was the only heir then in being who was interested in the estate.

On April 11, 1914, something under five months after the decedent's death and nine months and eight days after the interlocutory decree of divorce, his widow gave birth to twin sons, who were named Edwin N. Walker and E. Earl Walker.

On the death of Walker, his daughter was appointed administratrix of his estate, and something more than a year later filed her final account as such and petitioned that the estate be distributed to her as the only heir. Thereupon

Mrs. Walker, as the guardian of her twin sons mentioned, filed a counter-petition for distribution of the estate equally to them with the daughter, as being children of Walker. To this petition the daughter filed an answer denying that the twins were the children of Walker and alleging that they were illegitimate.

The issue of legitimacy so presented has been tried twice, each time before a jury. On the first trial the jury found the children illegitimate; an appeal was taken on their behalf, and a new trial ordered by this court for errors in the admission of evidence and the giving of instructions. (*Estate of Walker*, 176 Cal. 402, [168 Pac. 689].) On the second trial the jury found the children legitimate and a decree of distribution was made based upon this verdict. From this decree the present appeal is prosecuted by the daughter, Mrs. Nason.

[1] On the first appeal it was held, in effect, that, under section 194 of the Civil Code providing that a child born within ten months after the dissolution of the marriage of the mother is presumed legitimate, the children here involved must be presumed legitimate, and that this presumption could be overcome only by proper and sufficient evidence showing one or more of three alternatives, namely, either (1) that the husband was impotent, or (2) that he was entirely absent from his wife during the period when the children must have been begotten, or (3) that he was present with his wife only "under such circumstances as afford clear and satisfactory proof that there was no sexual intercourse."

It appeared at the second trial, as at the first, that Walker was not entirely absent from his wife during the period of possible conception. It should, in fact, be noted that his wife testified to acts of intercourse during this period. The second of the alternatives mentioned was, therefore, not present in the case, and the trial revolved around the other two— the questions as to the impotency of the decedent, and as to his having been present with his wife only "under such circumstances as afford clear and satisfactory proof that there was no sexual intercourse."

The serious questions on this appeal arise in connection with the second of these two last-mentioned alternatives. Before discussing them, it may be well to dispose of the single question in connection with the first—the alleged im-

potency of the decedent. [2] The appellant requested and was refused a concise and specific instruction that if the jury found the decedent impotent, their verdict should be for the appellant. There was evidence sufficient to warrant the jury in so finding, and the appellant was entitled to have the issue so presented submitted to the jury by a direct and specific instruction. It was covered in the instructions given, but not so clearly and definitely as in the one requested. The question involved, however, is one so easily and completely appreciable by a jury as well-nigh to preclude the possibility of confusion or misunderstanding. The jury could not have failed to understand from the instructions given, taken in connection with the whole course of the trial, both that they were to pass on the alleged impotency of the decedent and also that if they found him impotent their verdict should be for appellant. This, after all, was the only purpose of the particular instruction requested, and that purpose being accomplished, it cannot be said that the refusal to give the particular instruction requested was prejudicial.

Passing now to the questions arising in connection with the second alternative involved here, namely, that Walker was present with his wife during the time of possible conception only under circumstances "such as afford clear and satisfactory proof that there was no sexual intercourse," it is not clear just what meaning should be given to the decision on the first appeal.

There are two possible views, each in accordance with a rule found in other jurisdictions. The first of these is that where it appears that the husband and wife have met during the time when the child must have been begotten, the presumption of legitimacy can be overcome only by it being made to appear that the circumstances under which the husband and wife met were such as to afford no opportunity for sexual intercourse, even if they had been so minded, or, putting it conversely, that if they met under circumstances which did afford such opportunity, it is conclusively presumed that intercourse did take place and the child legitimate, and evidence that intercourse did not in fact take place is not admissible.

The second possible view is that even though the parties met under circumstances which afforded an opportunity for intercourse, yet the presumption of legitimacy can be over-

come by showing that it was not in fact indulged in, and evidence showing, or tending to show this, is admissible.

The necessity for a determination as between these two possible constructions arises from the fact that if the first construction is the true one, and, therefore, the law of the case, it is practically an end of this appeal, since every error contended for by the appellant becomes immaterial, if the evidence should have been confined to a showing that the parties met only under circumstances which did not afford an opportunity for intercourse. There was practically no such evidence, although it did appear that the parties had met. The cause was not tried by the lower court on that theory, and was submitted to the jury on a hypothesis much more favorable to the appellant than that to which she was entitled, if the issue and the evidence should have been so confined.

In support of the view that the evidence should not be so confined is the ruling on the first appeal that evidence of the relations between the parties, and of their hostile feelings toward each other, was admissible "as tending to establish a relationship from which, depending upon other circumstances established and evidence of the disposition and character of the parties, the jury might fairly draw the inference that, notwithstanding opportunity therefor, intercourse was not had on the occasion when the husband visited his wife." For the purpose of showing such relationship the introduction in evidence of the interlocutory decree of divorce was approved, as was also evidence of quarrels between the parties, of the exchange of abusive epithets between them, and of statements on the part of the husband indicating feeling against his wife. The admission of such evidence, and the ground upon which its admission is expressly put, cannot be reconciled with the view that when once it appears that the parties have met under circumstances which permitted intercourse if they were so inclined, it is conclusively presumed that it took place and that the evidence must be confined to showing that the parties did not meet under such circumstances.

On the other hand, in support of the view that the issue and the evidence should be so confined, is the ruling on the former appeal that evidence was not admissible that the wife had given birth to an illegitimate child on February 1, 1913, about a month prior to the husband commencing his suit for divorce

and about five months prior to the interlocutory decree and the period of possible conception of the children here involved, and that this fact was known to the husband. Evidence merely that the wife had given birth to an illegitimate child was clearly inadmissible under either rule, or, in fact, under any rule. Standing alone, it would not tend to show that the husband did not have intercourse with the mother five months later, and if such intercourse was had, the presumption that the children here are the fruit of it is conclusive. There is no doubt but that the presumption of legitimacy goes at least to this extent, that if it appear that by the laws of nature it is possible that the husband is the father (that is, if it appears that the husband had intercourse with the mother during the period of possible conception), legitimacy is conclusively presumed, and no guessing or weighing of probabilities as to paternity because of relations between the mother and other men will be permitted. The only exception to this, if it really be an exception, is where it is clear that, although the husband had intercourse with the wife, yet by the laws of nature it is impossible for him to have been the father, as, for instance, where husband and wife are white and the child a mulatto. But when the evidence goes further than merely showing a previous illegitimate birth from the mother and shows that the husband knew of this fact, it is not possible to reconcile its exclusion with a rule admitting evidence of the relationship and feeling between the parties to rebut any inference that intercourse took place between them on the occasions when they met. It is difficult to conceive of anything which would more profoundly affect their relations than the knowledge or belief on the husband's part that his wife had a few months before given birth to a child conceived in adultery.

These two views are both adopted on the former appeal. They are in direct conflict, with the result that neither is the law of the case (*Gage* v. *Downey*, 94 Cal. 241, [29 Pac. 635]), and it is necessary to examine the question *de novo*.

The old English rule, at least as generally stated, was that if the husband were within the king's dominion and were not incapable of procreation, the child was presumed legitimate regardless of all other facts. It was carried to ridiculous extremes. "Although a woman has issue in adultery, nevertheless, by the common law, if her husband is able to beget children and is within the four seas, the issue is not regarded

as bastard. And this presumption is so strong that if *feme covert* goes into another country and there takes a husband and has issue by him, the first husband being within the four seas, the issue is a *mulier*, but it is otherwise if the baron be over the seas.'' (4 Viner's Abridgment, Bastard, A 2, p. 216.)

In modern times this harsh rule, like other similar rules of the common law, has been much modified, so that in general the actual fact may be examined into and the question not determined by formal rules.

Much the same change is apparently found in the Roman law. In the very interesting preface by Denis Le Marchant to his report published in 1828 of the Gardner Peerage case, page XIII, it is said:

''The earliest authority on this subject to which we can safely refer, is contained in the Digest, from whence it has descended into most of the codes of modern Europe. The same definition of legitimacy, though expressed in different terms, is given by two of the great Roman jurists. Paulus declares 'marriage to be proof of paternity,' whilst, according to Ulpian, 'the issue of a man and his wife are legitimate.'

''This definition did not originate with either of the writers by whom it is recorded. It probably was of great antiquity; for Julianus, who preceded them by more than a century, tacitly admits it, by determining it to be inapplicable to cases of non-access between a husband and wife; 'so that although a husband who lived constantly with his wife should not be allowed to withhold his recognition of her child, yet where he had been very long absent from her, and she had borne a child during such absence, the law pronounced the child not to be his.'

''Scaevola and Ulpian admitted this doctrine, but considering the presumption in favour of legitimacy to be still too strong, they allowed not only the fact of access, but of sexual intercourse to be disputed; and 'if it could be satisfactorily established that either from intervening infirmity, or from any other cause, no sexual intercourse between husband and wife had taken place, or if the husband had been in such a state of health as disqualified him from generating, the child who might have been born under these circumstances in the house of the husband, notwithstanding the publicity of its birth, was not the child of the husband.'

"The causes of adulterine bastardy were thus reduced to two, the impotence of the husband, and the absence of sexual intercourse between the husband and wife when the period of the wife's gestation commenced.''

The matter of the presumptions in cases of alleged adulterine bastardy came up in England in 1811 for elaborate discussion in the Banbury Peerage case, reported in the appendix (page 389) to Le Marchant's report of the Gardner case just mentioned. William, Earl of Banbury, had died in 1632, supposedly childless, but in 1661 one Nicholas laid claim to the dignity of the earldom, as the earl's son. From that time on the matter had been one of frequently recurring dispute. The evidence showed clearly that Nicholas was the son of the earl's wife. He was born about a year before the earl's death. The earl at the time was eighty years of age, while his wife was much younger. They had been married for some twenty-one years without fruition of the marriage. The birth of Nicholas—or at least the fact that Lady Banbury was his mother—was apparently unknown to the earl. There was much evidence which made it fairly certain that Nicholas was, in fact, not the son of the earl, but of one Lord Vaux. Under these circumstances the committee of the House of Lords proposed several questions to the judges and, among others, the question (page 430) whether the presumption of legitimacy could "be lawfully rebutted by evidence that such access did not take place between the husband and wife as by the law of nature is necessary to admit the husband to be the father of the child.'' The answer to this question and further questions to the judges which followed, together with their answers, are thus reported (pages 433–436):

"The Lord Chief Justice of the Court of Common Pleas (Sir James Mansfield) having conferred with his brethren, informed the committee that they were unanimously of opinion.

" 'That the presumption of legitimacy arising from the birth of a child during wedlock, the husband and wife not being proved to be impotent, and having opportunities of access to each other, during the period in which a child could be begotten and born in the course of nature, may be rebutted by circumstances inducing a contrary presumption.'

"The following question was then put to the judges: 'Whether the fact of the birth of a child from a woman united

to a man by lawful wedlock, be always, or be not always by the law of England *prima facie* evidence that such child is legitimate; and whether, in every case in which there is *prima facie* evidence of any right existing in any person, the *onus probandi* be always, or be not always, upon the person or party calling such right in question; whether such *prima facie* evidence of legitimacy may always, or may not always, be lawfully rebutted by satisfactory evidence, that such access did not take place between the husband and wife, as by the laws of nature is necessary in order for the man to be in fact the father of the child; whether the physical fact of impotency, or of non-access, or of non-generating access (as the case may be) may always be lawfully proved, and can only be lawfully proved by means of such legal evidence as is strictly admissible in every other case, in which it is necessary by the laws of England that a physical fact be proved.'

''The following question was also proposed to the judges: 'Whether evidence may be received and acted upon to bastardize a child born in wedlock after proof given of such access of the husband and wife, by which, according to the laws of nature, he might be the father of such child; the husband not being impotent, except such proof as goes to negative the fact of generating access?'

'' 'Whether such proof must not be regulated by the same principles as are applicable to the legal establishment of any other fact?'

''To which the judges answered: 'That after proof given of such access of the husband and wife, by which, according to the laws of nature, he might be the father of the child (by which they understood proof of sexual intercourse between them), no evidence could be received, except it tended to falsify the proof that such intercourse had taken·place, such proof must be regulated by the same principles as were applicable to the establishment of any other fact.'    Afterwards, the following questions were put to the judges:

'' '1. Whether, in every case where a child is born in lawful wedlock, sexual intercourse is not by law presumed to have taken place after the marriage, between the husband and wife (the husband not being proved to be separated from her by sentence of divorce), until the contrary is proved by evidence sufficient to establish the fact of such non-access; as negatives such presumption of sexual intercourse, within the period

when, according to the laws of nature, he might be the father of such child?'

" '2. Whether the legitimacy of a child born in lawful wedlock (the husband not being proved to be separated from his wife by sentence of divorce), can be legally resisted, by the proof of any other facts or circumstances than such as are sufficient to establish the fact of non-access during the period within which the husband, by the laws of nature, might be the father of such child; and whether any other question but such non-access can be legally left to a jury, upon a trial, in the courts of law, to repel the presumption of the legitimacy of a child so circumstanced?'

"The Lord Chief Justice of the Court of Common Pleas delivered the unanimous opinion of the judges as follows:

" '1. That in every case where a child is born in lawful wedlock, the husband not being separated from his wife by a sentence of divorce, sexual intercourse is presumed to have taken place between the husband and wife, until that presumption is encountered by such evidence as proves, to the satisfaction of those who are to decide the question, that such sexual intercourse did not take place at any time, when by such intercourse the husband could, according to the laws of nature, be the father of such child.'

" '2. That the presumption of the legitimacy of a child born in lawful wedlock, the husband not being separated from his wife by a sentence of divorce, can only be legally resisted by evidence of such facts or circumstances as are sufficient to prove, to the satisfaction of those who are to decide the question, that such sexual intercourse did not take place between the husband and the wife at any time when, by such intercourse, the husband could, by the laws of nature, be the father of such child. Where the legitimacy of a child in such a case is disputed, on the ground that the husband was not the father of such child, the question to be left to the jury is, whether the husband was the father of such child; and the evidence to prove that he was not the father must be of such facts and circumstances as are sufficient to prove, to the satisfaction of a jury, that no sexual intercourse took place between the husband and wife at any time, when, by such intercourse, the husband, by the laws of nature, could be the father of such child.'

" 'The non-existence of sexual intercourse is generally expressed by the words "non-access of the husband to the wife"; and we understand those expressions, as applied to the present question, as meaning the same thing; because in one sense of the word access, the husband may be said to have access to his wife, as being in the same place, or the same house; and yet, under such circumstances, as, instead of proving, tend to disprove that any sexual intercourse took place between them.' "

For the purposes of the present discussion two points in connection with these questions and answers are to be particularly noted. First, it was declared specifically that although the husband and wife might have had opportunities for access to each other, yet evidence was admissible to rebut any inference from this that they did in fact have it.    Second, that the word "access" is used in the sense of sexual intercourse.    The importance of this second point lies in the fact that there has been confusion as to the meaning of the word in this connection.    It has been assumed that it meant only "access" in the sense that the husband saw or visited his wife, had "access" to her presence.    It is largely from this misunderstanding of the sense in which this particular word was used that the impression has arisen that when "access" by the husband to the wife in the sense of their meeting so as to afford an opportunity for sexual intercourse is shown, the matter is concluded and proof that intercourse did not take place is not admissible.    An instance of this confusion is *Bury* v. *Philpot*, 2 Mylne & K. 349, [39 Eng. Reprint, 977], decided in 1834 and frequently cited, wherein the master of the rolls, Sir John Leach, declared "access is such access as affords opportunity of sexual intercourse; and where the fact of such access between husband and wife within a period capable of raising the legal inference as to the legitimacy of an after-born child is not disputed, probabilities can have no weight; and a case ought never to be sent to a jury."

Upon the delivery in the Banbury case of the answers quoted, Lord Redesdale (page 436), Lord Ellenborough (page 455), and Lord Eldon (page 484) delivered opinions following the rules contained in the answers and holding that Nicholas was illegitimate.    Lord Erskine (page 464) delivered an opinion to the contrary, maintaining that the presumption of legitimacy could be overcome only by proof of nonaccess in

the sense of a lack of opportunity for sexual intercourse. The committee then divided, the majority presenting a report against the claimant, a descendant of Nicholas, which was adopted by the house.

The answers to the questions so propounded have ever since been followed as the law of England, notwithstanding *Bury* v. *Philpot, supra.* Thus in the leading case of *Hargrave* v. *Hargrave,* 9 Beav. 552, [50 Eng. Reprint, 457], from which the language quoted on the first appeal in this case as stating the general principles applicable is taken, Lord Langdale said: "In the course of the investigation I apprehend that evidence of every kind, direct or presumptive, may be adduced, for the purpose of showing the absence of sexual intercourse, which, in cases where there has been some society, intercourse, or access, has been called nongenerating access. We have therefore to attend to the conduct and the feelings, as evidenced by the conduct of the parties toward each other and the offspring, and even to the declarations accompanying acts, which are properly evidence. Such circumstances are of no avail against proper evidence of generating access; but they may have weight, when the effect of that evidence is doubtful." (See, also, *Morris* v. *Davies,* 5 Clark & F. 163; *Cope* v. *Cope,* 5 Car. & P. 604, 24 Eng. C. L. 730; *Reg.* v. *Mansfield,* 1 G. & D. 7; 1 Q. B. 444; *Gordon* v. *Gordon,* [1903], Pr. Div. 141.)

Any detailed consideration of the American cases is unnecessary, for they, like the subsequent English cases, in the main, look back to the Banbury Peerage case and *Hargrave* v. *Hargrave, supra,* in order to determine the 'rule of the common law, and the differences between the American cases are largely due to a misinterpretation of one or the other of these two leading English cases. See, for an instance, *Scanlon* v. *Walshe,* 81 Md. 118, 130, 131, [48 Am. St. Rep. 488, 31 Atl. 498].

[3] The result of the American decisions is thus stated, and correctly, in 3 R. C. L. 728: "But there is considerable conflict of authority on the question whether opportunity of sexual intercourse between them (husband and wife) must be shown to have been impossible to rebut the presumption (of legitimacy). There are authorities which take the position that the question to be presented to the jury in a case of this character, is not whether the mother of the child and her husband did or did not have sexual intercourse at or about the time the

wife became pregnant, but whether the opportunity for sexual intercourse by any possibility presented itself to them. If it did, then, unless impotency can be shown, the presumption of legitimacy is conclusive. On the other hand, according to this view, if the opportunity could not by any possibility have presented itself to them then the presumption is rebutted. The authorities which take these views are in the minority, the great weight of authority being to the effect that access, that is an opportunity for sexual intercourse, need not be shown to have been impossible, and that where an opportunity for sexual intercourse is shown, the presumption favoring legitimacy, while very strong, is not conclusive, and may be rebutted by showing that intercourse did not in fact take place.''

The English rule would seem to go so far as to permit evidence of nonintercourse even where the parties are cohabiting, i. e., living together in the same house or apartments. Such is not the rule in this state. (Code Civ. Proc., sec. 1962, subd. 5; *Estate of Mills*, 137 Cal. 298, [92 Am. St. Rep. 175, 70 Pac. 91.] **[4]** But with this statutory exception the true rule in America, as well as England, is, we believe, that if it is possible by the laws of nature for the husband to be the father (that is, if there was coition and no impotency), no inquiry will be permitted into the probabilities of the case one way or the other, but the presumption of legitimacy is conclusive; and, on the other hand, it is always permitted to show that it was not possible by the laws of nature for the husband to be the father, as by showing impotency on his part, want of intercourse during the possible period of conception, or that the child is of a race or color such that it could not have been conceived by the husband.

**[5]** The fact that it was not possible by the laws of nature for the husband to be the father, where that fact is in issue, is to be inquired into in the same manner as any other fact which is the subject of judicial inquiry, and any competent evidence relevant to the question is admissible as in other cases, it being the rule, however, in California, as in many jurisdictions, that neither the husband nor the wife is competent to testify to lack of intercourse. (*Estate of Mills, supra.*)

**[6]** It should perhaps be noted that when it is said that the presumption of legitimacy is conclusive if it were possible by the laws of nature for the husband to be the father, it is

not meant that the proof of the fact of such impossibility must itself be beyond possibility of doubt.  The two things are very different.  The fact to be proven is that the husband could not by the laws of nature be the father, as, for example, because of lack of intercourse with the mother.  The evidence of that fact is not required to be such as to prove it beyond any possibility of doubt.  A jury would be justified in finding a lack of intercourse, with the consequence that it was impossible that the husband be the father upon evidence which did not show such lack beyond possibility of question.  The presumption of legitimacy is strong and the proof of impotency or nonintercourse must be clear and satisfactory, but this is all. The presumption does not operate to change the general rule that in civil cases the issue is to be determined upon the preponderance of evidence, but like other presumptions operates under and beneath that rule.

It remains to apply the foregoing views to the particular case.  [7]  It is apparent at once that the action of the lower court in not confining the evidence to a showing of want of opportunity for intercourse between Walker and his wife was correct, and that errors complained of by appellant must be judged on the basis that although such opportunity did appear, yet evidence to the point that intercourse during the critical period did not take place was admissible, and the question of whether it did or did not was the real question to be submitted to and decided by the jury.

[8]  Of the rulings of the lower court complained of, the one most prejudicial to the appellant was the rejection of evidence, both direct and on cross-examination, that Mrs. Walker had given birth to an illegitimate child some five months before Walker must have had intercourse with her, if the children here involved are really his, and that Walker knew of this fact.  Such evidence, if admitted, might well have resulted in a different verdict.  The matter, however, is concluded by the decision of this court on the former appeal. One of the grounds, if not the principal ground, upon which a second trial was directed, was the admission of this very evidence at the first trial.  It is true, as we have said, that such ruling was not, in our present judgment, reconcilable with the principle underlying other rulings in the same decision, nor with the true rule applicable in such cases.  But whatever may be said as to the reasons for it, the ruling itself

is specific, and constituted a mandate to the lower court which
it was bound to follow.    Error cannot be predicated upon the
action of the lower court in so doing.    The ruling is the law of
the case and does not come within the principle of *Gage* v.
*Downey*, 94 Cal. 241, [29 Pac. 635].

[9]   Complaint is made that the trial court refused to per-
mit evidence as to who was the father of the twins other than
Walker and at the same time refused to instruct the jury that
it was not necessary for them to find who the father was, if
Walker was not.    But it is clear from what has been said that
the evidence was properly confined to proving nonintercourse
by the husband.    On that issue evidence of relations by the
wife with another man or other men is wholly immaterial.
Such relations may have existed, and yet if intercourse were
had with the husband during the period of possible conception,
the presumption is conclusive that the children are his.    As
to the refusal to charge the jury that they need not find who
the father was, if Walker was not, the jury were explicitly
instructed that the only question for them to determine was
whether the children were the children of Walker.    The in-
structions given and the whole course of the trial make it plain
that the jury could not have been misled on this point, or have
conceived it their duty to find Walker to be the father unless
they could determine the identity of the man who was.

The lower court several times charged the jury that the
presumption of legitimacy could be overcome only by "clear
and satisfactory" evidence, to which was added on one oc-
casion the adjective "convincing" and on another the ad-
jective "certain," and the giving of such instructions is
assigned as error.    [10]   That the presumption of legiti-
macy can be overcome only by clear and satisfactory proof
is the law.    If it were intended by the adjectives "cer-
tain" and "convincing" to instruct the jury that the proof
must go beyond a reasonable doubt, and change the rule that
civil cases are to be determined upon the preponderance of
evidence, the instruction was incorrect.    It does not, however,
admit of this interpretation.    The jury was expressly in-
structed that they were to determine the issue by a pre-
ponderance of evidence, and the context of the instructions
containing the adjectives in question makes it plain that they
were used in the same sense as "clear and satisfactory," and
must have been so understood.

The trial court charged the jury with relation to the decree of interlocutory divorce as follows: "The interlocutory decree was admissible, among other things, as tending to establish a relationship from which, depending upon other circumstances proved and evidence of the disposition and character of the parties, from which (*sic*) you might fairly draw the inference that, notwithstanding opportunity therefor, sexual intercourse was not had on the occasions when the husband visited the wife. *Nevertheless standing alone such decree is entitled to little weight.* It did not dissolve nor affect the relationship of husband and wife—it was merely a judicial determination that at the time the children were begotten the wife was not living with her husband, that is, dwelling in the same house with him as his wife."

[11] The portion of this instruction as to the little weight to be given to the fact of an interlocutory decree between the parties is clearly an instruction as to the weight of evidence, and under our constitutional prohibition of such instructions, its giving was error. It is true that the instruction is in almost the exact language used by this court on the former appeal in commenting on the interlocutory decree. But the views of an appellate court on the weight of evidence are no more the proper subject of a charge to the jury than similar views of the trial court. If we could bring ourselves to believe that possibly this instruction had had any effect on the jury, we would send the cause back for a new trial without hesitation. But we cannot bring ourselves so to believe.

The material point of the interlocutory decree was that it suspended marital rights and obligations and the usual incidents of the marital relation, and destroyed any inference or presumption from the fact of marriage that the parties were living together or having intercourse. But there could have been no mistake in the minds of the jury upon this point. They were charged, probably more favorably to the appellant than the strict rule would warrant, that there was an actual presumption of law arising from the interlocutory decree that the parties did not cohabit, which presumption had to be overcome by evidence, and that in the absence of a reconciliation between them cohabitation would be an act essentially immoral, and there was a presumption of law that an immoral act is not indulged in. Such instructions must have made it clear to the jury just what the effect of the interlocutory de-

cree was, and just what part it could properly play in enabling them to determine the final question of fact submitted to them, Did or did not Walker have intercourse with his wife during the period of possible conception of the children here involved? In view of this it is not possible to say that the single sentence with regard to the weight to be given the interlocutory decree standing alone was prejudicial.

The appellant also complains that the jury were instructed that before they could find the children illegitimate, they must find on clear and satisfactory proof that "Walker could not be their father." But such instruction, as we have seen, is a correct statement of the law. Counsel has confused the proving by a preponderance of evidence that the husband could not possibly be the father (as to which the jury was accurately charged) with proving beyond a doubt that he could not be. This matter we have already discussed.

The foregoing are the more serious contentions of appellant with respect to the evidence and the instructions. There are quite a number of others, but their discussion would not be helpful and would still further lengthen this already long opinion. Suffice it to say, that the facts of this case are such that we have examined the record carefully with a view to ascertaining if there were any respect in which it could be fairly said that the jury might have been misled or confused and that we have found none. Much might be said in regard to the weight of evidence, but that was a matter solely for the trial court on a motion for a new trial.

The appellant also complains of alleged misconduct at the trial by opposing counsel. We find no basis for such complaint. The particular conduct most relied on is certain remarks to the jury in the course of argument. But the making of such remarks is denied by opposing counsel, they were not assigned as misconduct at the time, and they were urged before the lower court on a motion for a new trial and a new trial denied. The trial court was in a better position to pass on the merits of such a complaint and was also much freer to act than an appellate court, if the trial seemed to it in any respect unfair.

The last point made by appellant is that the court did not have jurisdiction to make the decree of distribution appealed from, that it had jurisdiction only to preside at the trial "and issue judgment on the verdict," whatever may be meant by that.

Now, the issue tried was an issue made by the petitions for distribution and the answers thereto. The trial having determined the issue, the decree followed as of course. The point apparently relied on to sustain the appellant's position is that pending the first appeal and while the first decree of distribution was in effect, the appellant being the administratrix of the estate, as such administratrix delivered to herself as the only distributee under the decree all the property of the estate, and then had herself discharged as administratrix. All that this really means is that the first decree of distribution under which the appellant received the property having been vacated, the appellant now has property to which she is not entitled and for which she must account. (*Heydenfeldt* v. *Superior Court*, 117 Cal. 348, [49 Pac. 210]; *Ashton* v. *Heydenfeldt*, 124 Cal. 14, [56 Pac. 624]; *Ashton* v. *Heydenfeldt*, 127 Cal. 442, [59 Pac. 759]; *Ashton* v. *Heggerty*, 130 Cal. 516, [62 Pac. 934]; *Ashton* v. *Zeila etc. Co.*, 134 Cal. 408, [66 Pac. 494].)

It cannot affect the right of the minor children to have a decree distributing to them their part of the estate upon the issue as to their heirship being determined in their favor.

The court did not lose jurisdiction of the estate by the order discharging the administratrix. That order was founded and conditioned on the first decree of distribution, and this decree having been vacated on appeal, the matter stood as though no decree had ever been made. (*Ashton* v. *Heydenfeldt*, 124 Cal. 14, [56 Pac. 624].)

Decree of distribution affirmed.

Shaw, J., and Lawlor, J., concurred.