[No. D018779. Fourth Dist., Div. One. May 30, 1996.]

In re the Marriage of JOHN C. and B. KAY FREEMAN.
JOHN C. FREEMAN, Appellant, v.
B. KAY FREEMAN, Respondent.

**COUNSEL**

Gary K. Olsen, Lascher & Lascher, Wendy C. Lascher and Gabriele Mezger-Lashly for Appellant.

Hervey, Wood & Cheatum and Kim W. Cheatum for Respondent.

**OPINION**

**BENKE, Acting P. J.**—In this case we consider the child support obligations which may be imposed on a husband following dissolution of a marriage. We conclude that during the very early years of a child's life, the support obligation is based solely on actual or presumed biological paternity.

Thereafter, notwithstanding evidence of biological paternity, a husband's obligation to support a child may be found in the nature and extent of the husband's social relationship with the child. Given these principles, we affirm the support order imposed on appellant.

## I

### FACTUAL BACKGROUND

Appellant John C. Freeman (John) had a vasectomy in 1977. In 1982 John married respondent B. Kay Freeman (Kay) and because Kay wanted children John underwent two vasectomy reversal procedures. Following the first reversal in 1983, John produced no live sperm. Following the second reversal in 1985, John's sperm count went up to approximately one-fourth of the live sperm experts agree is needed to be fertile. Over the course of the following year, Kay's gynecologist attempted to artificially inseminate Kay with John's semen. Kay did not become pregnant.

In early 1987, while still having unprotected sexual relations with John, Kay began having unprotected sexual relations with J. C. Brown. In June 1987, Kay became pregnant. Upon learning she was pregnant, Kay told John about the affair and agreed not to see Brown again. Kay gave birth to a daughter, C., in February 1988.

Shortly after C.'s birth, John and Kay separated for a short time and Kay resumed her relationship with Brown. In the spring of 1988 Kay became pregnant again. John moved back in with Kay and she delivered a son, B., in February 1989. In April 1990 John and Kay separated.

## II

### PROCEDURAL HISTORY

In November 1990 John filed a dissolution petition in which he alleged there were no children of the marriage. Kay responded to the petition by alleging the marriage produced two children, C. and B.

In January 1991 John filed a motion to determine paternity by way of blood testing and to join Brown as a third party respondent. Kay opposed the motion and argued John was conclusively presumed to be the father of C. under former Evidence Code section 621 (now Family Code,[1] §§ 7540,

---

[1]All further statutory references are to the Family Code.

7541).[2] In a successful motion to move the dissolution proceedings to San Diego, Kay also presented evidence John had treated C. as his own child.[3] Brown was thereafter joined as a third party and the parties agreed Brown was B.'s father.

In the trial court, John attempted to avoid the conclusive presumption he was the father of C. by establishing he was sterile within the meaning of section 7540. The trial court resolved the sterility issue at a factual hearing. Both experts called by the parties at the sterility hearing agreed that given John's low sperm count and lack of success in achieving pregnancy through artificial insemination, it was very unlikely John could have fathered a child at the time C. was conceived. John's expert stated John was not fertile but that "sterility" was not an accurate term given recent medical advances in treating infertile couples. Kay's expert stated that although he doubted John was C.'s father, he defined sterility as a zero sperm count and since John had a sperm count at the time of C.'s conception, John was not sterile.

In its findings on the sterility issue, the trial court stated: "Since it is remotely possible that petitioner could have fathered the child, [C.] the court finds by a preponderance of the evidence, that petitioner was not sterile within the meaning of Evidence Code Section 621 at the time of conception of [C.]."

---

[2] Section 7540 states: "Except as provided in Section 7541, the child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage." Section 7541 states: "(a) Notwithstanding Section 7540, if the court finds that the conclusions of all the experts, as disclosed by the evidence based on blood tests performed pursuant to Chapter 2 (commencing with Section 7550), are that the husband is not the father of the child, the question of paternity of the husband shall be resolved accordingly. [¶](b) The notice of motion for blood tests under this section may be filed not later than two years from the child's date of birth by the husband, or for the purposes of establishing paternity by the presumed father or the child through or by the child's guardian ad litem. As used in this subdivision, 'presumed father' has the meaning given in Sections 7611 and 7612. [¶](c) The notice of motion for blood tests under this section may be filed by the mother of the child not later than two years from the child's date of birth if the child's biological father has filed an affidavit with the court acknowledging paternity of the child. [¶](d) The notice of motion for blood tests pursuant to this section shall be supported by a declaration under oath submitted by the moving party stating the factual basis for placing the issue of paternity before the court. [¶](e) Subdivision (a) does not apply in any of the following cases: [¶](1) A case which reached final judgment of paternity on or before September 30, 1980. [¶](2) A case coming within Section 7613. [¶](3) A case in which the wife, with the consent of the husband, conceived by means of a surgical procedure."

[3] The evidence included a Mother's Day card John had written to Kay shortly after C.'s birth in which he stated: "I always knew you would be a wonderful mom. I just never realized how much joy I would feel being a Dad again." Kay also presented photographs of John with C. and a Christmas card John wrote to C. shortly before her first birthday. In the Christmas card John stated: "I love you my daughter with all my heart." Finally, we note Kay presented a copy of John's September 1988 will in which he acknowledged C. and the child Kay was then carrying as his own and left them shares in his estate equal to the shares he left his children from his first marriage.

Prior to the sterility hearing, John filed a brief in the trial court which, in addition to setting forth contentions with respect to sterility, argued that as applied to John, the conclusive presumption of paternity was unconstitutional. The trial court made no findings and reached no conclusions with respect to John's constitutional challenge to application of the conclusive presumption. Rather, six months after the trial court's resolution of the sterility issue, the parties submitted a stipulated judgment to the trial court. The stipulated judgment recited the trial court's sterility finding and stated "and therefore blood tests could not be ordered with regard to [C.] pursuant to Evidence Code Section 621. In view of the Court's order filed May 22, 1992, it is conclusively presumed, and the Court pursuant to this Agreement adjudges and decrees, that Husband is the father of [C.]." By its terms the judgment preserved John's right to appeal from the judgment.

Thereafter, the trial court entered the judgment, finding John was C.'s father and awarded Kay $1,000 in monthly child support. In a separate order the trial court also awarded Kay $8,000 in attorney fees to defend the judgment on appeal.

John filed timely notices of appeal from the judgment and the order awarding attorney fees and we consolidated his appeals.

## III

### ISSUES ON APPEAL

On appeal John argues he was sterile within the meaning of section 7540; in the alternative, he contends the section 7540 presumption of paternity should not be applied to him. He also argues he should have been allowed to present evidence which would have estopped Kay from relying on the presumption and that the trial court erred in awarding Kay attorney fees on appeal.

## IV

### DISCUSSION

A. *Child Support Obligation*

Before directly confronting the contentions John has raised on appeal, we believe it will be helpful to briefly outline the circumstances under which an obligation of child support may be imposed upon a husband when a marriage is dissolved.

### 1. *Statutory Presumption*

Under sections 7540 and 7541, a husband who was cohabitating with his wife at the time of conception is presumed to be the father of his wife's child. The statute itself provides two means of rebutting the presumption: a husband may dispute paternity by requesting blood tests within two years of the child's birth (§ 7541, subd. (b)) and, at any time, by proving he was impotent or sterile at the time of conception. (§ 7540.) In the absence of a timely motion for blood tests or proof of impotency or sterility, the presumption is conclusive. (§ 7540.)

This statutory presumption has a very long and indeed ancient history. The presumption that children born during a marriage are children of the husband has its earliest recognized roots in Roman law; from Roman law the presumption descended to early European codes and was the subject of 17th century English common law. (See *Estate of Walker* (1919) 180 Cal. 478, 484-491 [181 P. 792].) As it existed in California through the middle of this century, the presumption could be rebutted by proof that it was not biologically possible for the husband to be the father of a particular child. (*Id.* at p. 491; *Hughes* v. *Hughes* (1954) 125 Cal.App.2d 781, 784-786 [271 P.2d 172].) " 'The modern authorities sustain the propositions that the presumption of legitimacy from the birth of a child during marriage may be rebutted by evidence which clearly and conclusively shows that the procreation by the husband was impossible; and that it is competent to show that according to the course of nature, the husband could not be the father.' " (*Hughes* v. *Hughes*, *supra*, 125 Cal.App.2d at pp. 786-787.) Shortly after *Hughes* v. *Hughes* was decided and consistent with the holding in that case, the Legislature added sterility to impotency as an exception to the conclusive presumption. (Stats. 1955, ch. 948, § 3, p. 1835.)

However, very shortly after the sterility exception was added to the statutory presumption, the development of reliable blood testing compelled our courts and the Legislature to reconsider the nature of the presumption and the circumstances under which it may be rebutted. In 1980 the Legislature added what is now section 7541 providing for rebuttal of the presumption by blood testing requested within two years following a child's birth.

The Legislature's reexamination of the presumption was fully described by the court in *In re Marriage of B.* (1981) 124 Cal.App.3d 524, 528-531 [177 Cal.Rptr. 429], when the court explained: "Early California cases were able to justify the conclusive presumption in question on the ground that no competent evidence could be adduced to indicate who among those who had had intercourse with the wife during the period of possible conception was

the biological father of the child born to her. However, as blood tests became scientifically reliable so that they could exclude a husband as the biological father, the courts sustained the legislative mandate by unabashedly calling it a substantive rule of law. This was dramatically emphasized in *Kusior* v. *Silver* (1960) 54 Cal.2d 603 [7 Cal.Rptr. 129, 354 P.2d 657], where as here, it was argued that there was no longer a reasonable relationship between the presumption and the fact sought to be presumed. In reply to this argument, our Supreme Court said: 'There are significant reasons why the integrity of the family when husband and wife are living together as such should not be impugned. A conclusive presumption is in actuality a substantive rule of law and cannot be said to be unconstitutional unless it transcends such a power of the Legislature.' [Citation.]

". . . . . . . . . . . . . . . . . . . . . . .

". . . The Legislature, by its 1980 amendment to section 621 has recognized that blood tests are now reliable evidence on the issue of paternity. The conclusive presumption, however, has been retained subject to what amounts to a two-year statute of limitations on a husband's right to introduce such evidence. The legislative reasoning behind the amendment is probably found in 20 Stan. L.Rev. 754 titled *California's Tangled Web: Blood Tests and the Conclusive Presumption of Legitimacy* [citation]. We say *probably* because the article was written before the amendment. . . .

"Although the author recognizes that many legal commentators and judges attack the conclusive presumption because it has no relationship to the ultimate fact, he then suggests another public policy reason for supporting the conclusive presumption. As stated earlier, it would appear to be the very reason that was accepted by the Legislature when it amended section 621. The article states: 'In the case of a young child the most palpable relation that anyone has to the child is a biological relationship. The child has no personality, he can communicate with no one, and no one can be said to have exercised a formative influence on his character. But in the case of an older child the familial relationship between the child and the man purporting to be the child's father is considerably more palpable than the biological relationship of actual paternity. A man who has lived with a child, treating it as his son or daughter, has developed a relationship with the child that should not be lightly dissolved and upon which liability for continued responsibility to the child might be predicated. This social relationship is much more important, to the child at least, than a biological relationship of actual paternity. [¶] . . . The burden of child support is still founded on a relation of the man to the child. In a sense this is a *paternal* relation, although the man may not be the child's biological father . . . . [¶] . . .

Where a strong social relationship to the child has not yet developed, the only basis for a duty on the husband's part to support the child is biological fatherhood of the child. Inasmuch as blood tests are the most reliable evidence of nonpaternity, they should be admissible on the issue of biological paternity in all cases where this issue is the recognized foundation of liability for child support—cases, that is, that involve a contest over the legitimacy of a young child. . . . [¶] Rules of evidence, however, are an oblique response to the problem of defining the proper sphere of each competing policy. . . . This indirection is inexcusable where, as here, the conflict between the policies can be resolved more rationally by the simple expedient of a statute limiting the time in which actions to escape responsibility for a child born to a married woman may be brought. [¶] *The adoption of a statute of limitations in lieu of the present tangle of evidentiary rules* offers the obvious advantage of greatly simplifying the law and at the [same] time moving the law to closer conformity with the relevant policies. A statute of limitations would eliminate the present injustice of denying a husband conclusive evidence of nonpaternity—blood tests—in those cases in which paternity is the determinative question. . . . The Legislature should address itself squarely to the problem of defining a period after the birth of a child during which biological paternity would be determinative of a husband's duty to support his wife's child, and it should announce clearly that after this period has expired biological nonpaternity shall be irrelevant to the existence of this duty.' [Citation.] (Italics added.)" (Fn. omitted.)

Like the court in *In re Marriage of B.*, we believe the Legislature intended precisely the result urged by the law review commentator: under sections 7540 and 7541 biology will control determination of paternal responsibility for a limited period early in a child's life and thereafter the predominant consideration must be the nature of the presumed father's social relationship with the child.

However, the statutory presumption is not applicable in all cases. Because, by its terms the conclusive presumption prevents presentation of evidence with respect to the issue of biological paternity, it has been the subject of a number of constitutional challenges. The courts have resolved these challenges by balancing the public and private interests which arise in particular cases. Thus the cases have consistently held that where the state does not have a legitimate interest in enforcing the conclusiveness of the presumption, an interested party may, notwithstanding the presumption, present evidence which establishes that a husband is not the biological father of his wife's child. (*In re Lisa R.* (1975) 13 Cal.3d 636, 647-649 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017]; *County of Orange* v. *Leslie B.* (1993) 14 Cal.App.4th 976, 980 [17 Cal.Rptr.2d 797].)

In particular, the courts have found that where a husband leaves the marriage before the birth of the child and never assumes parental responsibility, the presumption cannot be used to exclude evidence that would establish the identity of the child's biological father. (See *County of Orange v. Leslie B., supra,* 14 Cal.App.4th at p. 980; *In re Melissa G.* (1989) 213 Cal.App.3d 1082, 1086-1087 [261 Cal.Rptr. 894].) "As Justice Scalia noted in *Michael H.*, irrebutable presumption cases ultimately call into question not the adequacy of the procedures but 'the adequacy of the "fit" between the classification and the policy that the classification serves.' [Ctiation.] In this case, in which [the child] has no available mother, her presumed father is a stranger to her, and her most important psychological relationship is to a sibling to whom she is presumed biologically unrelated, we conclude the statute's classification does not serve the interests it was designed to protect." (*In re Melissa G., supra,* 213 Cal.App.3d at p. 1089.)

### 2. *Estoppel*

Significantly, a husband's obligation to support his wife's children may arise quite apart from the presumption set forth in sections 7540 and 7541 and apart from whether he is the biological father of the children. A line of cases holds that the conduct of a husband with no biological ties to a child may nonetheless estop the husband from avoiding parental responsibilities even after the husband's marriage to the child's mother is dissolved. (*Clevenger v. Clevenger* (1961) 189 Cal.App.2d 658, 662 [11 Cal.Rptr. 707, 90 A.L.R.2d 569]; *In re Marriage of Valle* (1975) 53 Cal.App.3d 837, 842 [126 Cal.Rptr. 38]; *In re Marriage of Johnson* (1979) 88 Cal.App.3d 848, 852 [152 Cal.Rptr. 121].)

The estoppel cases are based in large measure on interests very simliar to those discussed by the court in *In re Marriage of B.* "The relationship of father and child is too sacred to be thrown off like an old cloak, used and unwanted. We are dealing with the care and education of a child during his minority and with the obligation of the party who has assumed as a father to discharge it. The law is not so insensitive as to countenance the breach of an obligation in so vital and deep a relation, undertaken, partially fulfilled, and suddenly sundered.

"We have been careful, however, to restrict the indicated liability of the putative father to the case in which he represents to the child expressly or by implication that he is the child's natural father and the child believes him to be the natural father. We do not suggest that the husband who supports his wife's child by another man necessarily incurs liability for the support of that child. Here, if the facts so show, we predicate an estoppel upon the

child's acceptance of the representation of the putative father that he is the natural father. The analogous situation in which the putative may be charged with a putative marriage rests upon the reputed wife's 'belief in the existence of a valid marriage.' [Citation.]

"We emphasize a second limitation on the husband's liability: the representation must be of such long continuance that it frustrates the realistic opportunity of discovering the natural father and truly establishes the paternal relationship of the putative father and the child. We do not discuss here a relationship of some passing days; this relationship continued over the span of a decade." (*Clevenger* v. *Clevenger*, *supra*, 189 Cal.App.2d at pp. 674-675.)

In *In re Marriage of Valle* and *In re Marriage of Johnson*, the estoppel theory was applied to six-year parent-child relationships. The court in *In re Marriage of Johnson* emphasized that no express representation of paternity is needed where such a representation can be implied from the husband's conduct: "In this case, however, Andrew assumed the role of Jimmy's father from the very moment of Jimmy's birth and continued to play that role for Jimmy's entire life. Jimmy has known Andrew only as his father and has known no other in that capacity. Although Andrew apparently never expressly represented to Jimmy that he was his father, it is patently clear that his conduct was such that an implied representation to that effect was made and that Andrew intended Jimmy to accept and act upon such representation. It is equally clear that Jimmy was ignorant of the true facts and gave Andrew his love and affection." (88 Cal.App.3d at p. 852.)

With this background in mind we turn to John's contentions on appeal.

### B.   *John's Parental Responsibility*

#### 1.   *Sterility*

John does not dispute that he was married to and cohabitating with Kay at the time C. was conceived. Moreover he does not dispute that he failed to request blood testing within two years of C.'s birth. John contends the presumption of paternity does not arise here because he was sterile within the meaning of section 7540.

In attacking the trial court's finding he was not sterile, John relies on cases decided before blood tests could, with certainty, determine biological paternity. As we have noted, the earlier cases justified the presumption on the general inability of science to determine paternity but permitted a husband to

avoid the presumption when he could prove "by the laws of nature" that he could not be the father. (*Estate of Walker, supra,* 180 Cal. at p. 491; *Hughes v. Hughes, supra,* 125 Cal.App.2d at p. 785.)

John argues that by adding sterility as an exception to the presumption, the Legislature meant to incorporate fairly broad concepts of inability and infertility discussed by the courts in *Estate of Walker* and *Hughes.* We reject John's argument. The Legislature has made it clear that although it is now possible to determine biological paternity with certainty, biology is not the predominant consideration in determining parental responsibility once a child has reached his or her third year of life. (*In re Marriage of B., supra,* 124 Cal.App.3d at p. 531.) Thus a broad interpretation of the sterility exception would undermine the Legislature's preference for preserving the rights and responsibilities inherent in established parental relationships.

We also note the potential for advances in the treatment of infertility. Although the experts in this case agreed that John had severely diminished fertility, his level of fertility might soon represent a fairly realistic opportunity to procreate. Were we to add some notion of diminished or impaired fertility to the definition of sterility, we would only create the potential for expert disputes over what, at any given time, represents a realistic opportunity to reproduce.

Thus we define sterility in the strictest sense. It is limited to cases where, by a preponderance of the evidence, a party can demonstrate that the presumed father could not produce live sperm count at the time of conception. Here the record is clear John was capable of producing live sperm at the time C. was conceived. Accordingly, John was not sterile within the meaning of section 7540.

### 2. *Application of the Presumption*

As an alternative to his contention that he was sterile, John argues that application of the conclusive presumption in this case serves no valid state interest and therefore deprives him of his right to due process of law. Relying on *County of Orange* v. *Leslie B., supra,* 14 Cal.App.4th 976, and other cases which have declined to apply the presumption of paternity, John contends that because he and Kay have dissolved their marriage and he has no continuing contact with C., the state has no valid interest in requiring that he, rather than Brown, provide support for her.

We do not accept John's narrow definition of the state's interest. The state's interest in applying the presumption is not limited to assuring adequate support for a child or protecting existing marriages from interference.

Rather, as we have noted, the state has a well-recognized interest in preserving and protecting the dignity of parental relationships, especially when a marriage is being dissolved and instability is being introduced into a child's life. (See *Susan H.* v. *Jack S.* (1994) 30 Cal.App.4th 1435, 1442-1443 [37 Cal.Rptr.2d 120]; *Clevenger* v. *Clevenger, supra,* 189 Cal.App.2d at pp. 674-675.) "The state has an 'interest in preserving and protecting the developed parent-child and sibling relationships which give young children social and emotional strength and stability.' [Citation.] This interest is served notwithstanding termination of the mother's marital relationship with the presumed father." (*Susan H.* v. *Jack S., supra,* 30 Cal.App.4th at pp. 1442-1443.)

On this record, however, we are unable to determine whether during the two years John lived with C. he developed any relationship with her or engaged in other conduct which would make it fair to impose a support obligation on him. Although John raised the issue of whether the presumption could be applied to him in the brief he filed before the sterility hearing, the trial court made no ruling on the issue. Moreover, following the trial court's ruling on the sterility issue John took no further steps to obtain a ruling on his due process claim. As we have noted, John did not ask for further findings with respect to the nature of his relationship with C. but, instead, stipulated to a judgment which provides that in light of the court's resolution of the sterility issue, he is not entitled to blood tests.

Under these circumstances we believe John waived his right to assert that application of the presumption violates his right to due process. ■ " 'Ordinarily the failure to preserve a point below constitutes a waiver of the point. [Citation.] This rule is rooted in the fundamental nature of our adversarial system . . . . " 'In the hurry of the trial many things may be, and are, overlooked which could readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them.' " . . . [¶] The same policy underlies the principles of "theory of the trial." "A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing party." [Citation.] The principles of "theory of the trial" apply to motions . . . .' [Citation.] [¶] ■ "Although an appellate court, in its discretion may allow an appellant to raise a new issue of law on appeal, appellate courts ' "are more inclined to consider such tardily raised legal issues where the public interest or public policy is involved." ' [Citation.] However, if the new theory contemplates a factual situation the consequences of which are open to controversy and

were not put in issue or presented at trial the opposing party should not be required to defend against it on appeal. [Citation.]" (*Sommer* v. *Gabor* (1995) 40 Cal.App.4th 1455, 1468 [48 Cal.Rptr.2d 235].)

■ Here, if John desired a ruling on his due process claim, he had ample opportunity to request one from the trial court before entering into the stipulated judgment. (See *Sommer* v. *Gabor, supra,* 40 Cal.App.4th at p. 1468.)

John also suggests the statute is arbitrary because it permits impotent and sterile men to avoid parental responsibility at any time while requiring men such as himself, who are only infertile, to request blood tests in the first two years of life. However, as the estoppel cases demonstrate, although impotent or sterile men may not be subject to the presumption, they may still be required to support children they have treated as their own. (See *Clevenger* v. *Clevenger, supra,* 189 Cal.App.2d at pp. 674-675.) Indeed, by way of the estoppel theory, impotent and sterile men are subjected to paternal responsibility on substantially the same basis employed in applying the statutory presumption to infertile men: the nature and duration of their relationships with their putative children. (See *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 836, 847-848 [4 Cal.Rptr.2d 615, 823 P.2d 1216] [paternity distinctions based on nature of presumed father's relationship with presumed child are valid].) Thus, the face of the statute does not create the disparate treatment which would raise substantial equal protection concerns.

In sum, we reject John's constitutional challenges to the conclusive presumption because John abandoned his due process claim and because, on its face, the presumption does not create disparate treatment between otherwise similarly situated individuals.

C. *Kay's Conduct*

■ John also claims that he should have been allowed to present evidence that would estop Kay from asserting the two-year limitation on blood testing set forth in section 7541. He claims he did not ask for testing earlier because Kay promised him she would stop seeing Brown. However, the trial court limited the hearing to the issue of sterility and refused to permit questioning on the estoppel theory.

We question whether Kay's conduct could ever deprive C. of child support. (See *In re Marriage of Ayo* (1987) 190 Cal.App.3d 442, 451 [235 Cal.Rptr. 458]; § 3585.) Moreover, following the trial court's ruling on sterility, John made no effort to obtain a ruling on his estoppel theory, either

by motion or a request for findings. Rather, John simply stipulated to a judgment of paternity. Thus, notwithstanding our doubts about his theory, John waived his right to assert the issue on appeal. (See *Sommer* v. *Gabor*, *supra*, 40 Cal.App.4th at p. 1468.)

### D. *Attorney Fees on Appeal*

Finally, John urges it was inappropriate for the trial court to grant Kay's attorney fees on appeal. The record shows that John owns a valuable piece of real estate in La Jolla and has $7,000 a month in gross income. Kay has $3,500 a month in combined spousal and child support. Under these circumstances the trial court did not abuse its discretion in requiring that John pay Kay's attorney fees on appeal. (*In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 167-168 [18 Cal.Rptr.2d 743].)

Judgment and order affirmed.

Haller, J., and McDonald, J., concurred.

A petition for rehearing was denied June 19, 1996.