[L. A. No. 5530. In Bank.—August 25, 1919.]

In the Matter of the Estate of JOHN A. McNAMARA, Deceased. JOHN HAMILTON McNAMARA, a Minor, etc., Respondent, v. MARY JEANETTE McNAMARA et al., Appellants.

[1] APPEAL—ORDER GRANTING REHEARING—TIME.—An order directing a rehearing signed by the chief justice and two associate justices within thirty days after the judgment in Department is valid, notwithstanding the paper on which the signed order was written was not marked by the clerk as filed until after the expiration of the thirty-day period, since the joint action or concurrence of four associate justices, or of the chief justice and two associate justices, is the thing required to constitute the action of the court, and in contemplation of law this joint action is taken when the required number of justices have in writing declared their concurrence in the order with intent to make it an order and the filing in the clerk's office within the prescribed time is not essential to its validity.

[2] PARENT AND CHILD—SEPARATION OF PARENTS—SUBSEQUENT BIRTH OF CHILD—PRESUMPTION AS TO SEXUAL INTERCOURSE.—In determining the paternity of a child born after its mother left her husband to live with another man, it will be assumed that the husband and wife had sexual intercourse the last night they lived together.

[3] ID.—CONCLUSIVE PRESUMPTION OF LEGITIMACY—RULE IN CASES OF NORMAL PERIOD OF GESTATION.—In cases where only a usual and normal period of gestation is involved, the rule is well established that if it appear that it is possible by the laws of nature for the husband to be the father of the child, that is, if he had intercourse with his wife during the period of possible conception, he is conclusively presumed to be the father, and the law will permit no guessing or weighing of probabilities as between the husband and some other man, when both have had intercourse with the mother during the critical time and either may in fact be the actual progenitor.

[4] ID.—NORMAL PERIOD OF GESTATION—EVIDENCE—JUDICIAL NOTICE. In determining the legitimacy of a child born 304 days after the husband last had sexual intercourse with his wife, the question as to whether such period is greater than the usual and normal period of gestation, while one of fact, is one as to the operation of natural laws, and, therefore, as to a fact of which the court may take judicial notice and as to which it is not confined to the evidence in the record but may seek information elsewhere and in particular in published technical works and articles by those recognized as authorities on such branch of human knowledge.

[5] ID.—EXCEPTIONAL PERIOD OF GESTATION.—A period of gestation of 304 days is quite exceptional and not according to the usual and normal operation of the laws of nature.

[6] ID.—CHILDREN BORN WITHIN TEN MONTHS OF DISSOLUTION OF MARRIAGE—CODE PRESUMPTION PRIMA FACIE.—The presumption contained in section 194 of the Civil Code that all children of a woman who has been married, born within ten months of a dissolution of the marriage, are presumed to be legitimate children of such marriage, is but *prima facie,* and the reasons of policy which would justify or induce a *prima facie* presumption in such a case are very different from those which would justify or properly induce a conclusive presumption.

[7] ID.—CONSTRUCTION OF SECTION 194, CIVIL CODE—MONTHS OF THIRTY DAYS.—The ten months mentioned in section 194 of the Civil Code must be taken to mean months of thirty days.

[8] ID.—EXCEPTIONAL PERIOD OF GESTATION—CONCLUSIVE PRESUMPTION OF LEGITIMACY INAPPLICABLE.—The conclusive presumption of legitimacy is not applicable to a case where the child was born 304 days after the husband last had sexual intercourse with the mother, since such period of gestation is exceptional and not according to the usual operation of the laws of nature.

[9] ID.—REBUTTAL OF PRIMA FACIE PRESUMPTION OF LEGITIMACY— SUFFICIENCY OF EVIDENCE.—The *prima facie* presumption of legitimacy of section 194 of the Civil Code is overcome by evidence that during all the time when normally the child would have been con-

ceived the mother was living with a man not her husband taken in connection with the other facts of the case.

[10] ID.—LEGITIMATION OF CHILD BY ADOPTION—SUFFICIENCY OF EVIDENCE.—The legitimation of a child by adoption in the manner provided by section 230 of the Civil Code is proven by the act of the father in signing the child's birth certificate describing himself as the father, acknowledging it as his on numerous occasions, consistently treating it as legitimate, and receiving it into the only family he had, which consisted of the child and its mother.

[11] ID.—PATERNITY OF CHILD—EVIDENCE—TESTIMONY OF WIFE—NONACCESS WITH HUSBAND AFTER SEPARATION.—In an action involving the legitimacy of a child, the testimony of the mother tending to show that her husband had had no sexual intercourse with her after she had separated from him is admissible, in view of section 1870, subdivisions 1 and 15, and section 1879 of the Code of Civil Procedure.

[12] ID.—LEGITIMATION BY ADOPTION—EVIDENCE—DECLARATIONS OF PUTATIVE FATHER.—In an action involving the paternity of a child, declarations of the putative father that he is the father are admissible to prove legitimation by adoption.

[13] ID.—ORDER OF PROOF—DISCRETION.—In an action involving the paternity of a child born to a married woman after separation from her husband and while she was living with another man, objection to declarations of paternity by the latter until it had been shown that the husband was not the father goes to the order of proof, and is a matter almost entirely within the discretion of the trial court.

APPEAL from a decree of partial distribution of the Superior Court of Los Angeles County. James C. Rives, Judge. Affirmed.

The facts are stated in the opinion of the court.

Daniel M. Hunsaker, Boyd C. Barrington and Hunsaker, Britt & Edwards for Appellants.

John W. Carrigan for Respondent.

OLNEY, J.—Preliminary to the discussion of this appeal it is advisable to correct the record of this court regarding it. It was decided by us in Department on December 18, 1918. A petition for rehearing in Bank was duly filed and on January 17, 1919, an order was signed by the chief justice and two associate justices directing a rehearing. This was within thirty days after the judgment in Department and,

therefore, within the time prescribed by the constitution within which rehearings may be granted. It appears, however, that the order was given the date of January 18, 1919, which was thirty-one days after the Department decision and not within the prescribed time. The order was also marked by the clerk as filed on January 18, 1919.

[1] The fact that the paper on which the signed order was written was not marked by the clerk as filed until after the expiration of the period of thirty days from the time of the Department decision is not material to the validity of the order. The joint action or concurrence of four associate justices or of the chief justice and two associate justices, "is the thing required to constitute the action of the court" (Const., art. VI, sec. 2), and, in contemplation of law this joint action is taken when the required number of justices "have, in writing, declared their concurrence in the order with intent to make it an order." "The filing of the order in the clerk's office within the prescribed time was not essential to its validity," if it was regularly made within that time by the necessary number of justices (*People* v. *Ruef,* 14 Cal. App. 624, 626, [114 Pac. 48, 54]; *Niles* v. *Edwards,* 95 Cal. 47, [30 Pac. 134]; *Von Schmidt* v. *Widber,* 99 Cal. 515, [34 Pac. 109].) It is therefore unnecessary, as a matter of law, to correct the entry as to the time of filing or to order a filing *nunc pro tunc* as of January 17, 1919. But as the date of the order makes it appear that it was made after the expiration of the thirty days, contrary to the fact, and might tend to cast doubt on the validity of further action by the court in the case, we deem it advisable to correct the order in that respect.

It is, therefore, ordered that the order heretofore made in this case vacating the judgment previously entered herein in Department, and directing a hearing thereof before the court in Bank, be and the same is hereby corrected as to its date by striking out the words "January 18, 1919," as written therein, and inserting instead thereof the words "January 17, 1919," the same being the true date of the making of said order.

Passing now to the consideration of the appeal itself, it appears that the decedent, John A. McNamara, died May 10, 1916, unmarried and without a valid will. In the course of the administration of his estate, one John H. McNamara, a

minor, through his guardian, presented a petition for partial distribution of the estate to him, alleging that he was the illegitimate child of the decedent and that he had been legitimated by adoption in the manner prescribed by section 230 of the Civil Code. The section mentioned provides for legitimation rather than for adoption in the ordinary sense, and in order that the petitioner's right of heirship be established, it was necessary for him to show that he was in fact the illegitimate son of the decedent and also that he had been adopted by the decedent in the manner specified by the code section. The heirs of the decedent, if the child were not his heir, were two sisters, and these sisters filed objections to the child's petition, and in particular took issue with the allegations of the petition as to both of the two elements required by the code section for legitimation, that is, as to the petitioner being in fact the offspring of the decedent, and as to his having been adopted by him. There were other issues made, but the two issues mentioned were the real issues and alone need be considered. The cause was tried without a jury, the lower court found for the child upon both issues, and made an order of partial distribution in his favor. From this order the sisters appeal, and urge that the finding of the lower court in the child's favor is not supported by the evidence as to either issue. Certain rulings in the admission of evidence are also complained of. The chief contention is over the finding of paternity and will be first considered.

The salient facts are that the petitioner is the child of a Mrs. Bettencorte. She was quite a young woman and had married one Antonio F. Bettencorte, in July, 1913, and lived with him, occupying the same apartment up to and through the night of December 23d of the same year. On the morning of the following day she went with her husband to the city of San Jose, a few miles from where they resided, and there left him about noon to go immediately with McNamara, the decedent, with whom she lived practically continuously thereafter until his death. She never saw her husband again but once, and then under circumstances that preclude the possibility of intercourse between them. As throwing some light on the relations of the parties and the character of the mother, it may be mentioned that she had been engaged to McNamara, had had some quarrel with him, and had immediately married Bettencorte. She seems to have found herself very

unhappy in her marriage, never to have lost her affection for McNamara, and in her unhappiness to have turned to him. She had no illicit relations with McNamara prior to her finally leaving her husband, and there is in the record no evidence, in fact no breath of suspicion, that she had illicit relations with anyone but McNamara.

On October 24, 1914, just ten calendar months, or 304 days, after Mrs. Bettencorte left her husband, the child was born. No question seems ever to have occurred to anyone until after McNamara's death but that the child was his. Certainly no question occurred to him. No physician was present at the birth and McNamara himself made out and signed the birth certificate, specifying himself as the father. In letters to the child's mother he addresses her as his wife and speaks of her as such and of the child as their child. He endeavored to make a will leaving his property to "Rosalie A. Bettencorte, the mother of my son, and with whom I have been living as my lawful wife for the past year pending the securing of a divorce by her. She is to have all and everything that I die possessed of for the benefit of herself and her child." He also directs Mrs. Bettencorte, in case of his death, to communicate with his sister, one of the appellants here, saying that she will see that his wishes are carried out. The will failed because not witnessed and not entirely written in McNamara's own hand. The child and the mother lived with him, accompanied him on trips away and he supported them both. So far as appears, the relations between the three were the usual relations of a family of father, mother, and child.

In addition to the foregoing Mrs. Bettencorte testified (and in view of the court's finding her testimony must be taken as true, if competent) that she had her regular menstrual period commencing December 20, 1913, four days before she left her husband, and ending the day she left, and that she had another regular and full period commencing January 23d or 24th following, and that she had another menstruation, apparently shorter, in February. She also testifies that she first suspected she was pregnant in March or April. It also appears that the child when born was a fully developed and normal baby. It was not weighed, but the mother testified that her mother said at the time it was born that it weighed about eleven pounds. Another witness testified that it

weighed eight or nine pounds. If the child did in fact weigh eleven pounds at birth, it was exceptionally large and this fact might be a slight indication of a prolonged pregnancy. But estimates as to the weight of a new born baby are proverbially unreliable and the most that can be said is that the child was full-sized. On the other hand, there was no unusual circumstance accompanying either the pregnancy or the birth, and the fact of the mother's safe delivery without a physician may be a slight indication that the child was not of unusual size. The only medical evidence introduced was that of a physician called by the appellants, who testified that a period of gestation of 304 days or more was possible and not *very* unusual.

Upon the foregoing facts and evidence the point most strongly urged upon us on behalf of the appellants is that the question of the child's paternity is determined by a conclusive presumption of legitimacy. It is urged that it appearing that Mrs. Bettencorte and her husband were together on the night of December 23d, it must be presumed, as a matter of law, that intercourse took place between them at that time, and it further appearing that a child was born of Mrs. Bettencorte 304 days thereafter, and that this period is within the period of possible gestation, there is a conclusive presumption of law that the child is legitimate; that is, is the offspring of Mrs. Bettencorte's husband and not of the decedent.

[2] That it must be assumed, as urged by appellant's counsel, that the husband and wife had intercourse on the night of December 23d, when they were together cannot be doubted. That such is the rule in cases where the issue of legitimacy is involved is established in this state by *Estate of Mills,* 137 Cal. 298, [92 Am. St. Rep. 175, 70 Pac. 91]. The question, therefore, presented by appellants' contention is this: Is there a conclusive presumption of legitimacy when it appears that the mother has had intercourse with her husband 304 days before the birth of the child, but not subsequently?

The presumption of legitimacy is discussed in *Estate of Walker,* 180 Cal. 478, [181 Pac. 792]. It is there said that if it appear that it is possible by the laws of nature for the husband to be the father of the child, that is, if he had intercourse with his wife during the period of possible conception, he is

conclusively presumed to be the father, that the law will permit no guessing or weighing of probabilities as between the husband and some other man, when both have had intercourse with the mother during the critical time and either may in fact be the actual progenitor. [3] This rule in cases where only a usual and normal period of gestation is involved is thoroughly well established, and the reasons of policy upon which it is based are so strong that it is the rule of both the civil and the common law. There was, however, no attempt in the Walker case to do more than state the rule in a general way. Nothing more was necessary, as the evidence of intercourse with the husband there relied on to prove legitimacy was of intercourse during the time when, according to the usual operation of the laws of nature, the children involved must have been conceived. The application of the rule to such a case is not open to doubt.

But in the present case it appears conclusively that the husband did not have intercourse with his wife for a period of 304 days preceding the birth of the child. This period, if not exceeding, at least approaches an exceeding of the usual and normal period of gestation. Two questions, therefore, present themselves, neither of which was presented in the Walker case or there determined. The first of these is: Is the period of 304 days greater than the usual or normal—not merely the average—period of gestation, that is, is it contrary to the usual operation of the laws of nature? This is a pure question of fact. The second question is one of law, namely: Does the conclusive presumption of legitimacy apply where the period of gestation necessary in order that the husband be the father is not an impossible one, but is yet exceptional and not according to the usual operation of the laws of nature?

[4] The first question, while one of fact, is one as to the operation of natural laws, and, therefore, as to a fact of which the court may take judicial notice and as to which it is not confined to the evidence in the record, but may seek information elsewhere and in particular in published technical works and articles by those recognized as authorities in this branch of human knowledge. An examination of recent medical textbooks and articles leaves no doubt as to two points—first, that 304 days is a possible period of gestation and, next, that it is quite an exceptional one. While the average period of gestation

is generally taken as 280 days, there are instances vouched for by reputable authorities where the period has exceeded 330 days, and there are instances, too well authenticated apparently to admit of reasonable question, where the period has exceeded 320 days. See, for instance, the case reported by Dr. Taussig in his monograph on Prolonged Pregnancy, appearing in XLIV American Journal of Obstetrics, 519. In this same article also Dr. Taussig compiles (page 524) a list of well-authenticated cases which would seem to justify his conclusion that "in this total of 61 reliable cases of *partus serotinus* (delayed birth) we have a mass of evidence that should make even the most conservative acknowledge that this condition occurs in the human race, just as it has long since been proved to exist in the lower animals." (See, also, Cragin—The Practice of Obstetrics, pp. 156–164; 1 Edgar—The Practice of Obstetrics, p. 128; 2 Witthaus and Becker—Medical Jurisprudence, pp. 507–520; 3 Wharton & Stille—Medical Jurisprudence, pp. 30–39.)

On the other hand, a reading of these same authorities makes it plain that any period in excess of three hundred days is quite exceptional and that with each day over three hundred the exceptional character of the case is much intensified. Dr. Taussig, in his article, endeavors to compile all well-authenticated cases where the period exceeded three hundred days and accepts but sixty-one as falling with reasonable certainty within this class. This small number strongly evidences the exceptional character of such cases, as does also the fact that those investigating the subject concern themselves with every case where the period may be supposed to exceed three hundred days. This would not be true if such cases were not looked upon as quite exceptional and, therefore, worthy of note and investigation. A number of authorities (see page 514 of 2 Witthaus & Becker) fix three hundred days as the extreme limit, a conclusion which apparently must be abandoned in the light of more recent information, but the fact that such an opinion could be held at all by capable modern investigators indicates that instances of more than three hundred days are entirely beyond the usual order of things. That this is the common experience of mankind is also indicated by the fact that in other countries three hundred days has been adopted by statutes as the limit of the presumptive period of gestation. (Art. 315 of the

French Civ. Code; *McNeely* v. *McNeely*, 47 La. Ann. 1321, [17 South. 928].) Dr. Edgar quotes von Winckel (2 Witthaus and Becker, 575) as saying that "in 6.8 per cent [of cases] the duration is over three hundred days." But the article in which this statement was made was published in 1890, and in 1900 or 1901 von Winckel published the results of his examination of thirty thousand five hundred cases, in which as best we can judge from the references to the article, he found but thirty-one cases, or less than one-tenth of one per cent, wherein it was reasonably certain the period was 302 days or more. [5] We can but conclude that the period involved in this case, 304 days, is quite exceptional and not according to the usual and normal operation of the laws of nature.

This conclusion makes necessary a consideration of the second question: Is the conclusive presumption of legitimacy applicable to such a case? This is not determined by any statutory provision. Section 1962, subdivision 5, of the Code of Civil Procedure, provides: "The issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate." Read literally this section would apply only where the wife is cohabiting with her husband at the time of issue, that is, of birth. This was not the fact in the present case. But putting upon the section the meaning it undoubtedly should have, namely, that issue of a wife cohabiting with her husband at the time of conception must be indisputably presumed legitimate, it yet does not determine the present case, for it still leaves open the very question involved, of when was conception or during what period must it be presumed to have taken place.

Section 194 of the Civil Code provides: "All children of a woman who has been married, born within ten months after the dissolution of the marriage, are presumed to be legitimate children of that marriage." [6] This presumption is but *prima facie*. (*Estate of Walker*, 176 Cal. 402, 408, [168 Pac. 689].) It is urged, however, in effect, that it is a statutory declaration of policy that ten months is to be taken by the law as not exceeding the reasonable or normal period of gestation, so that all the incidents of birth within the normal period, such as the conclusive presumption of legitimacy, attach. There are several answers to this, but two will suffice. The presumption of the code section is but *prima*

*facie,* and the reasons of policy which would justify or induce a *prima facie* presumption in such a case are very different from those which would justify or properly induce a conclusive presumption. The legislature might well deem it wise to provide that a child born within ten or eleven or even twelve months after separation of husband and wife, as was actually done in Pennsylvania, should be presumed legitimate in the absence of any other evidence, when it would be wholly unwilling to make such presumption apply contrary to all other evidence.

[7] In the next place the ten months mentioned by the statute must be taken to be months of thirty days. No other construction will give it a reasonable operation. It is dealing with the working of natural laws where any proper measure of time must be an absolute and regular one, such as days or hours, not an irregular one, such as calendar months. If this be not so, the legitimacy of a child might depend on the purely fortuitous circumstance that the marriage of its mother was dissolved in one month of the year instead of another. The long months occur irregularly during the year and more of them accumulate in one period of ten months than in another. For example, if the child were born 306 days after the dissolution of its mother's marriage, it would be presumed legitimate if the dissolution had happened to occur on any day in April prior to the 29th, while if the child were so unfortunate as to have had the dissolution of its mother's marriage occur in any day in February, it would not be presumed legitimate by the statute unless it were born within 303 days thereafter. Such arbitrary and unreasonable inconsistencies and distinctions affecting so vital a matter would make the law ridiculous and are to be avoided if by reasonable construction of the statute they can be. The word "month," when spoken of as a regular and constant measure of time—each month having the same length—as is not infrequently done, is commonly conceived of as having thirty days. The statute is applying the measure of months to something which should be measured by a constant and regular standard, where each month must have the same length, and the reasonable construction is to put upon the word "month" as so used the meaning which it commonly has when used in that manner, that is, a month of thirty days, so that the ten months' period specified is one of three hundred days. We

believe that the necessity for this meaning is so plain that it is one "apparent from the context" within the language of section 14 of the Civil Code. This construction we are the more willing to put upon the statute in view of the fact that in those countries where there is a presumptive period of gestation it is more usually this time.

Other than the two code sections mentioned there is no statutory provision which bears upon the question. Nor is much assistance to be derived from previous decisions. So far as the question has been presented to the courts at all, the trend is apparently to the view that the conclusive presumption does not apply where the period of gestation required, in order that the husband be the father, is an exceptional although a possible one.

The point was presented in the Gardner Peerage case (Le Marchant's report). There the child was born 311 days after the wife left the husband to join her paramour, with whom she continued for some time. There was much testimony *pro* and *con* as to this time being a possible period of conception, and counsel for the child urged strongly that the testimony showed it was a possible period, and that this being the fact, a conclusive presumption of legitimacy followed. The House of Lords determined that the child was illegitimate. The decision, however, cannot be given much weight here, for the reason that the evidence that 311 days was a possible period was strongly controverted, and the two lords delivering opinions put them briefly on the ground that they were convinced of the fact of illegitimacy without stating anything more. It may fairly be said that they may have believed 311 days was not a possible period and have reached their conclusion for that reason.

In *Burnsby* v. *Baillie*, L. R. 42 Ch. Div. 282, the period between the separation of husband and wife and the birth of the child was 279 days. The child was found to be illegitimate. There was a good deal of testimony as to the *ordinary* period of gestation, and Judge North, who decided the case, in his opinion says that "having regard to the normal or usual period of gestation," he is unable to come to a positive conclusion, and finally puts his decision on the ground that he was satisfied the parties had not had intercourse for some time before their separation. The inference from the decision, but it is only an inference, is that the conclusive pre-

sumption was applicable in the court's mind only in the case of intercourse by the husband within the usual period of gestation.

*Bosville* v. *Attorney-General*, L. R. 12 Prob. Div. 177, comes nearest to being directly in point. The facts are practically identical with those of the case at bar except that the period intervening between separation of husband and wife and the birth of the child was but 277 days. The medical testimony introduced was to the effect that the normal time of gestation was from 270 to 275 days and that a longer time, although not unknown or even uncommon, was exceptional. The case was left to the jury, which found the child illegitimate. On review the very argument here urged upon us was urged upon the court. It was contended that it appearing that the husband and wife had occupied the same apartments up to 277 days before the birth, it must be presumed that intercourse was had between them as late as 277 days before birth, and that such time being within the period required for gestation, a conclusive presumption of legitimacy followed. This contention was overruled and the verdict of the jury upheld. The case may, therefore, be fairly considered as directly holding in opposition to the contention of appellants here. It is not entitled to particular weight, however, because of the unsatisfactory reason given, which is that one presumption cannot be built upon another, a proposition which we do not believe applicable to such a case.

*People* v. *Case*, 171 Mich. 282, [137 N. W. 55], may perhaps be considered as tending the other way. It was there held in a bastardy proceeding that a child born only 253 days (eight months and thirteen days) after the husband's liberation from jail and a renewal of relations with his wife must be conclusively presumed legitimate. The decision was based on evidence that the maximum period of gestation was three hundred days and the minimum 240. The point under discussion here, however, was not considered or apparently suggested.

So far as we are aware, the foregoing are all the authorities which can be said to have any real bearing on the question. We are therefore compelled to treat it as one of first impression. So approaching it, it is apparent at the outset that the conclusive presumption of legitimacy must either be extended to apply to every case where the period of gestation necessary

in order that the husband be the father is a possible one, no matter how exceptional or extraordinary such period may be, or else it must be limited in its application to those cases where the period necessary to make the husband the father is within normal or usual limits. There is no middle ground. It is apparent also from what has already been said that the facts with which the law has to deal in this regard are that while the average period of gestation is 280 days, there are exceptional and rare instances where it exceeds 320 days and it is probable that there are instances where it exceeds 330 days. The situation, therefore, is either that a child born 320 days after separation of husband and wife, and probably a child born 330 days or more after, must be conclusively presumed to be legitimate regardless of what the evidence may show as to the mother having intercourse with another man than her husband during the normal period of conception and the entire absence of any symptoms of prolonged pregnancy, or else the conclusive presumption must be limited to cases where the husband has had intercourse with the wife during the normal period of conception. The mere statement of this proposition involves its answer. The conclusive presumption cannot be applied to such extreme and exceptional cases. To do so would be wholly unreasonable, and would be contrary to the legal presumption which exists in this state that ''things have happened according to the ordinary course of nature.'' (Code Civ. Proc., sec. 1963, subd. 28.)

Nor is there any reason of public policy which requires such extending of the conclusive presumption. The *prima facie* presumption of legitimacy which requires clear and satisfactory proof for its overcoming is founded on the policy of protecting the integrity of the family, of preventing the bastardizing of issue born in wedlock except upon clear and certain evidence. The reason for going beyond this *prima facie* presumption and applying a conclusive presumption wherever the husband has had intercourse with the wife during the time when the child must normally have been conceived, although others as well may have had intercourse with her during the same period, is the impossibility of determining under such circumstances who is the father. As was said in *Commonwealth* v. *McCarty*, 2 Clark (Pa.), 356, the process of conception is a hidden one and the organs perform their appropriate functions without the volition of the female and

without her being conscious that the process is going on.
Where she has had intercourse with more than one man at
about the same time and a child has resulted, neither she nor
anyone else can say with reasonable certainty which is the
father. Any weighing of probabilities under such circum-
stances is but guessing, and where t' ; husband is one of the
possible fathers, he must bear the burden of his relation to
the woman and be taken to be the father of her child.

There is one class of cases where it is recognized in this
country at least, that the husband is not to be taken as the
father of the child, even though he had intercourse with his
wife during the normal period of conception. That instance is
where the husband and wife are of the same race, as for in-
stance, white, and it appears that the wife has had intercourse
with a man of another race, as, for instance, a negro, and the
child is of mixed blood. (*Watkins* v. *Carlton*, 10 Leigh (Va.),
560; *Bullock* v. *Knox*, 96 Ala. 198, [11 South. 339]; *Wright* v.
*Hicks*, 12 Ga. 161, [56 Am. Dec. 451]; *Cross* v. *Cross*, 3
Paige (N. Y.), 139, [23 Am. Dec. 778].) The reason why
the conclusive presumption is not applied in such instances
is that the element of indeterminability which is the reason
for the presumption in the ordinary case is absent. It is clear
that the husband is not the father. The actual fact, in other
words, is capable of definite determination, and for this
reason the conclusive presumption which is a substitute for
such determination is not properly applicable.

The same element of indeterminability is lacking in the
class of cases under consideration where in order that the
husband be the father the period of gestation, while a possible
one, is exceptional and contrary to the usual course of nature.
The actual fact as to paternity can be determined with
reasonable certainty, if the probative facts capable of being
known are made to appear. The courts must reason in ac-
cordance with the usual operation of the law of nature, and
where it appears that the child was born at such a time that
the husband might possibly be the father but only in case
of a very exceptional departure from the usual operation of the
laws of nature, and it also appears that the wife has had inter-
course with another at the time when by the usual operation of
these laws he would be the father, the conclusion that the latter
is the father is, in the absence of any symptoms or circum-
stances indicating an exceptional period of pregnancy, well-

nigh irresistible. Nor is there any reason why this conclusion should not be followed in this class of cases as in other cases where the fact that the husband is not the father is capable of being shown clearly and satisfactorily and is so shown. The courts are reluctant to reach the conclusion of illegitimacy in any case, but reaching it there is no hesitation, and should be none, in giving it effect. **[8]** Our conclusion in the present case is that the issue of paternity is not determined by any conclusive presumption of legitimacy.

It does not follow that the *prima facie* presumption of legitimacy is not applicable. That presumption applies in every case of a child born in wedlock and can be overcome only by clear and satisfactory evidence. (*Estate of Walker, supra.*) It remains to consider whether the evidence in the present case is of that character.

**[9]** The circumstances in evidence leave no room for reasonable doubt. In addition to the fact that the child was born at a time much exceeding the normal period, if the husband were the father, we have the further circumstances that during all the time when normally it would have been conceived, the mother was cohabiting with McNamara, that in January, nearly a month after leaving her husband and after conception must have taken place if he were the father, she had a full menstrual period, something which may occur after conception but ordinarily does not, that computing from the commencement of this menstrual period as that preceding conception, as is usually done, the period of gestation was 274 days or only six days removed from the average period of 280 days and wholly within the limits of normal variation, and finally, that everyone concerned—McNamara, the girl, the girl's family, and so far as appears Bettencorte himself—believed without question that the child was McNamara's. The combined force of these circumstances is sufficient certainty to justify the finding of fact of the lower court as to paternity.

**[10]** The evidence is likewise fully sufficient to sustain the finding on the issue as to adoption. The requirements of the code (Civ. Code, sec. 230) for legitimation by adoption are two: First that the father must publicly acknowledge the child as his, and next, that he must treat it as if it were legitimate and in particular must receive it into his own family as his child. The evidence is ample on both points. A more public acknowledgment than the act of McNamara in

signing the child's birth certificate describing himself as the father, it would be difficult to imagine. In addition, the child was with him and its mother most of the time after its birth and the evidence shows that the relation openly assumed by him was that of father. His statements and his actions were both a public acknowledgment of the child as his and a consistent treatment of it as if it were legitimate. It was also received into his family within the meaning of the code. It has already been decided by this court that the word "family" as used by the code in this connection does not necessarily mean relations, but may mean the family in which or as part of which the father abides. (*Estate of Gird,* 157 Cal. 542, [137 Am. St. Rep. 131, 108 Pac. 499]; *Estate of Jones,* 166 Cal. 108, [135 Pac. 288].) In this sense the only family McNamara had after the birth of the child was the child and its mother, with whom he abided with occasional absences until his death with full assumption of the relation of father, mother, and child. It is worthy of note in this connection that while McNamara was so living with Mrs. Bettencorte and her child, his sister, one of the appellants, visited and stayed with them for some days. The relation between McNamara and Mrs. Bettencorte was, to be sure, unlawful, but this does not negative the plain fact that the family relation existed. It is attempted to distinguish this case from *Estate of Jones, supra,* where the facts establishing an adoption were much weaker, on the ground that McNamara had no fixed habitation. The parties did change their abode several times, but it was a change of abode. They were not mere wanderers or travelers. Where they were, they made their home. When they finally moved to the place where McNamara died, they did not rent the place but actually arranged to purchase it.

The alleged errors in the admission of evidence are three: First, the admission of testimony by Mrs. Bettencorte that she left her husband on December 24, 1913, and except on one occasion immaterial here did not see him again, in other words, testimony by a wife tending to show nonaccess by her husband; second, the admission of evidence of declarations by McNamara that he was the father of the child; and, third, the admission of testimony as to a declaration of Bettencorte at the time (December 26, 1913) he left the residence of Mrs.

Bettencorte's parents where he and she had been residing, that he was going to Redding in the northern part of the state.

The admission over objection of testimony by Mrs. Bettencorte tending to show nonaccess by her husband presents a question on which the courts are in hopeless confusion. So far as rulings in this state are concerned, it was held in *Estate of Mills*, 137 Cal. 298, [92 Am. St. Rep. 175, 70 Pac. 91], that testimony by a wife that she did not have intercourse with her husband at a time when she was cohabiting with him was not competent on an issue as to the legitimacy of her child. This ruling is a necessary result of our code provision that the issue of a wife cohabiting with her husband is indisputably presumed legitimate. It not being permitted to dispute the presumption of legitimacy under such circumstances, evidence disputing it is of course incompetent. Further than this our decisions have not gone. Mrs. Bettencorte's testimony does not come within the rule of *Estate of Mills, supra,* for she did not testify, nor was it claimed, that she did not have intercourse with Bettencorte as long as they cohabited. Her testimony was as to a separation between them and that she did not meet him afterward.

A reading of our code sections would seem to settle the question. Section 1870 of the Code of Civil Procedure reads: "In conformity with the preceding provisions, evidence may be given upon a trial of the following facts: 1. The precise fact in dispute. . . . 15. Any other facts from which the facts in issue are presumed or are logically inferable." Section 1879 of the Code of Civil Procedure reads (the italics are ours): "*All persons, without exception,* otherwise than is specified in the next two sections, who, having organs of sense, can perceive, and, perceiving, can make known their perceptions to others, may be witnesses. . . ."

The next two sections (sections 1880 and 1881 of the Code of Civil Procedure) purport to set forth the instances in which a person having direct knowledge of the facts is yet not competent as a witness. Testimony by a wife showing or tending to show nonaccess by her husband is not mentioned in either section. More explicit language could not well be devised and these sections are in our judgment controlling. It is true that they were considered in *Estate of Mills* and it was there said, in effect, that they do not abrogate the rule of the common law on this particular point. But this statement

was not necessary for the decision, which could have been rested solely on the ground that the evidence there presented was inadmissible, because material only to dispute an indisputable presumption. Even if the code sections were not controlling, from which conclusion we see no escape, the fact that any such rule of incompetency as is contended for by appellants actually exists at the common law has been seriously questioned and the reasons of policy advanced to justify it severely criticised. (See 3 Wigmore on Evidence, secs. 2063, 2064.)

[11] Our conclusion on this branch of the case is that the rule of *Estate of Mills, supra,* should not be extended further than it was actually there set down and applied, that is, to evidence by either wife or husband of nonintercourse between them at a time when they were cohabiting together, the evidence being offered on an issue as to the legitimacy of a child born to the wife, and that the rejection of the evidence in that instance is justified not so much because it is incompetent, as because it is immaterial, being offered to dispute an indisputable presumption. Within this rule the testimony of Mrs. Bettencorte does not come.

The next objection is to the evidence of declarations by McNamara that he was the father of respondent. The objection made is not so much that such evidence was wholly incompetent as that it was incompetent until it had been shown that the husband Bettencorte was not the father. As to its competency generally there can be no doubt. [12] It was clearly competent for the purpose of proving the acknowledgment of paternity by McNamara and his adoption of the child in the manner required by the code for legitimation. Being competent and material upon that issue it was, of course, admissible. Furthermore, McNamara being deceased, his declarations as to the relationship of the child to him were also admissible under the familiar pedigree rule. On this latter point, section 1870, subdivision 4, of the Code of Civil Procedure provides that evidence may be given of "the act or declaration, verbal or written, of a deceased person in respect to the relationship, birth, marriage, or death of any person related by blood or marriage to such deceased person." (See, also, Code Civ. Proc., sec. 1852; *Estate of Heaton,* 135 Cal. 385, [67 Pac. 321].)

[13]  As to the point that the evidence was incompetent until it had been shown that Bettencorte was not the child's father, this, in the first place, was a matter of the order of proof and almost entirely within the discretion of the trial court.  In the next place such evidence is not incompetent on the issue of paternity, which is the point really made on behalf of the appellant.  (*Hargrave* v. *Hargrave,* 9 Beav. 552; *Morris* v. *Davies,* 5 Clark & F. 163; *The Aylesford Peerage,* L. R. 11 App. Cas. 1.)  The real point of the authorities cited by appellants' counsel in this connection is either that declarations by the putative father are not alone sufficient to overcome the presumption of legitimacy, or else that where nonintercourse between husband and wife is not shown, such declarations are wholly immaterial.  Both of these propositions are true, but neither has application here.

The final objection of appellant is to the admission of declarations by the husband Bettencorte immediately after his wife left him that he was going to Redding.  These declarations were made at the time he left the residence of his wife's parents where he had been residing and in connection with his actual departure.  The fact that he went to Redding, where his wife was not, was material on the question of their separation.  The fact that he departed and that he intended to go to Redding is some evidence that he did go, and it is well established that declarations of intention are admissible under such circumstances.  For a quite notable case where on this particular point the facts are almost identical with those presented here, see *Mutual etc. Co.* v. *Hillmon,* 145 U. S. 285, [36 L. Ed. 706, 12 Sup. Ct. Rep. 909, see, also, Rose's U. S. Notes].

It should perhaps also be stated that even if this evidence were strictly inadmissible, its bearing on the real matter in dispute is so slight that it is impossible that the appellants were prejudiced by its reception.

There are no other material errors complained of.

Order affirmed.

Shaw, J., Angellotti, C. J., Lawlor, J., Wilbur, J., and Lennon, J., concurred.

MELVIN, J., Dissenting.—I dissent.

The policy of the law has always been to favor legitimacy and to prevent, except upon the most convincing proof, the

bastardization of a child born to a married woman. I believe the opinion of Mr. Justice Olney, in which all of my other associates concur, forsakes this oft-declared policy and is moreover against the letter of our statute. I believe this decision, as a result of which a woman is permitted successfully to attach the stigma of illegitimacy to her little boy, will stimulate many similar efforts on the part of others who desire to spend the money left by deceased bachelors.

The presumption arising because of the ancient policy of the law to which I have referred above is well set forth in an opinion written by the learned author of the prevailing opinion in this case. I refer to *Estate of Walker*, 180 Cal. 484, 181 Pac. 792. In the opinion in that case (at page 794) I find the following language: "There is no doubt but that the presumption of legitimacy goes at least to this extent: That if it appear that by the laws of nature it is possible that the husband is the father (that is, if it appears that the husband had intercourse with the mother during the period of possible conception), legitimacy is conclusively presumed, and no guessing or weighing of probabilities as to paternity because of relations between the mother and other men will be permitted." In the opinion delivered by Mr. Justice Victor E. Shaw upon the former appeal in that case (*Estate of Walker*, 176 Cal. 402, [168 Pac. 689]), he quoted, approvingly, the following language from *Powell* v. *State*, 84 Ohio St. 165, [36 L. R. A. (N. S.) 255, 95 N. E. 660] : " 'Public policy requires that the status of a child born or begotten in lawful wedlock should be fixed and certain, and the immediate exigencies, or even the apparent justice, of any particular case, will not justify a departure from the rule so necessary and salutary to the best interests of society. The law is not willing that a child shall be declared a bastard to suit the whim or purpose of either parent, nor upon evidence merely that no actual act of intercourse occurred between husband and wife at or about the time the wife became pregnant.' " Continuing, Mr. Justice Victor Shaw used the following language: "Before such a child can be adjudged a bastard, the proof must be clear, certain, and conclusive, either that the husband had no powers of procreation, or the circumstances were such as to render it impossible that he could be the father of the child." The court cited the following authorities: *Dennison* v. *Page*, 29 Pa. St.

420, [72 Am. Dec. 644]; *Kraus* v. *Kraus*, 98 Mo. App. 427, [72 S. W. 130]; *Orthwein* v. *Thomas*, 127 Ill. 554, [11 Am. St. Rep. 159, 4 L. R. A. 434, 21 N. E. 430]; *Egbert* v. *Greenwalt*, 44 Mich. 245, [38 Am. Rep. 260, 6 N. W. 654]; *Ewell* v. *Ewell*, 163 N. C. 236, [Ann. Cas. 1915B, 373, 79 S. E. 509]. (It is to be noted that, through a printer's error, the last-quoted sentence, as appears on page 410, 176 Cal., is erroneously credited to the opinion in *Powell* v. *State, supra*.) It is true that the old English rule known as the "*quattuor maria* rule," which conclusively assigned legitimacy to a child born to a married woman while the husband was within the four seas, except upon proof of his impotence, has been modified by modern decision. Generally, courts have adopted the rule laid down by Lord Langsdale to the effect that "the presumption may be wholly removed by proper and sufficient evidence showing that the husband was impotent; entirely absent, so as to have no intercourse or communication of any kind with the mother; entirely absent at the period during which the child must, in the course of nature, have been begotten; or present only under such circumstances as afford clear and satisfactory proof that there was no sexual intercourse." (3 R. C. L. 727.) This rule, however, is still based upon the presumption arising from the policy of the law in favor of legitimacy. That policy was in existence when subdivision 5 of section 1962 of the Code of Civil Procedure was adopted. That subdivision declares that "the issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate." Read in view of the policy of the law in favor of legitimacy, it seems to me that this subdivision means that the issue of a wife, born within the possible period of gestation after proven access of her husband, he being not impotent, is indisputably presumed to be legitimate. Mr. Justice Olney, in the prevailing opinion, concedes that the subdivision applies to the issue of a wife cohabiting with her husband at the time of conception. Let us suppose that in the present case the period of separation of the spouses instead of ten months had been nine. It seems to me that under the logic of the opinion the child would be conclusively presumed legitimate, for the case would then be like that of a husband living with his wife during all of the usual period of gestation. In such a state of facts I take it the paternity might not be impeached by a showing that the

infant was small and probably a child born eight months after conception. What reason is there for preventing inquiry in possible cases of subnormal pregnancy and permitting it in instances of that which may be abnormal? I can see none. Undoubtedly, in the operation of subdivision 5 of section 1962 of the Code of Civil Procedure, some children who are actually bastards will be held legitimate without power on the part of anyone to attack their standing in that regard. But that is in accord with the policy of the law which looks not to the possible foisting of a child upon a husband who might not have been the father, but seeks to prevent all possibility of a legitimate child having the stain and sorrow of illegitimate birth unjustly attributed to it as a sinister inheritance.

Does the unquestionable presumption of legitimacy cease with the period of 280 days after the last cohabitation of man and wife, that being, as we are informed, the average period of gestation? If not, when does the whole matter become open to the court's inquiry. Is it open to full inquiry on the two hundred and eighty-first day or any day thereafter on which a child shall be born to the woman? Would this court sustain a finding that the child in this case was illegitimate if, instead of a little more than three weeks, the birth had passed the average period by only a day? If not, when would the passage of time become sufficient to justify such a finding? Would it be one minute after three hundred days, since we are told that instances of pregnancy of more than three hundred days are "entirely beyond the usual order of things?" Is the period covered by the indisputable presumption subject to the guessing of each judge of the superior court who may have a problem of this sort, he to be governed not by the testimony of experts but by such knowledge of the laws of nature as he may be able to acquire from medical works to which he may have access? These are questions no one of which is answered by the prevailing opinion.

Suppose, for illustration, a case exactly like this, except that instead of being true to one lover, after deserting her husband, the woman had possessed half a dozen to whom she had yielded herself very soon after the desertion.

According to the logic of the opinion it would then be the duty of the court to guess whether the husband, the deceased lover, whose estate was sought, or some one of the living but

possibly impecunious Don Juans, was the father, or, as some-
one jestingly said at the oral argument, whether or not the
baby was "of the progeny of a syndicate." It seems to me
that many evils must flow from the announced rule of this
court and that the wisdom of extending the presumption of the
statute to the utmost possible period of gestation is enforced
by the illustration.

If the matter of legitimacy or bastardy is one purely of fact,
to be drawn from the evidence adduced as in any other case,
then the presumption of intercourse from possible access
should be abolished; but this court upholds the doctrine of
*Estate of Mills,* 137 Cal. 298, [92 Am. St. Rep. 175, 70 Pac.
91], and by it supports the conclusion that the husband and
wife had sexual relations on the last night on which they
were together, which is founded, as was declared in the opin-
ion in that case, upon "good morals and public policy." To
allow cohatiting married people thus to impeach the legiti-
macy of children born in wedlock would be, as well stated in
the opinion in *Estate of Mills,* "to allow evidence which shocks
every sense of decency and propriety." Yet in the case at
bar evidence quite as shocking was permitted, namely, the
statement of Mrs. Bettencorte regarding her alleged men-
strual periods. This is the sort of testimony which may be
manufactured without fear of contradiction. Its admission
puts a premium upon perjury. In the case at bar it is evi-
dent that one of the controlling elements of the finding of
the probate court was the testimony of the woman regarding
her menstrual periods. Such testimony should have been ex-
cluded under what I believe to be the true interpretation of
subdivision 5 of section 1962 of the Code of Civil Procedure.

All of these considerations make me adhere to the doctrine
now repudiated by this court but expressed so clearly and
forcibly by Mr. Justice Olney in the opinion in the Walker
case that I venture to quote it here a second time (following
the pious example of clergymen who sometimes emphasize a
text by repetition):

"There is no doubt but that the presumption of legitimacy
goes at least to this extent: That if it appear that by the laws
of nature it is possible that the husband is the father (that is,
if it appears that the husband had intercourse with the mother
during the period of *possible* conception), legitimacy is con-

clusively presumed, and no guessing or weighing of probabilities as to paternity because of relations between the mother and other men will be permitted." (The italics are mine.)

Rehearing denied.

All the justices concurred, except Melvin, J., who dissented.