[Civ. No. 6194. First Appellate District, Division One.—April 30, 1928.]

MILLIE K. JACOBSON, Respondent, v. GEORGE W. LAMB, Appellant.

406

Corbet & Selby and W. C. Sharpsteen for Appellant.

Goldman & Altman for Respondent.

CAMPBELL, J., *pro tem.*—This is an action to recover on six promissory notes aggregating the principal sum of $24,000, all signed "King & Company; J. Charles King." The first of these notes is for $3,000, dated September 7, 1922; the second for $5,000 dated September 22, 1922; the third for $3,000, dated October 25, 1922; the fourth for $5,000, dated December 29, 1922. These four notes are

payable to Harry or Millie K. Jacobson. Harry Jacobson died prior to the commencement of the action, and plaintiff, his widow, acquired his interest in the notes. The fifth note is for $4,000, dated October 15, 1923, and is payable to the order of Millie K. Jacobson, and the sixth is for $4,000, dated March 31, 1923, payable to Bertha Kalisky. This last note was assigned to the plaintiff Millie K. Jacobson prior to the commencement of the action.

The case was tried by a jury, which returned a verdict for plaintiff and against each of the defendants George W. Lamb and J. Charles King, individually and as copartners, doing business under the name and style of King & Company, and King & Company, a copartnership, for the face value of the notes sued upon. From the judgment entered upon such verdict this appeal is taken.

King & Company continuously since 1906 has been a copartnership consisting of George W. Lamb and J. Charles King. The evidence discloses that defendants Lamb and King entered into a written agreement of partnership on November 1, 1906, for the purpose of conducting the business of draying under the name and style of King & Company. King was to manage the business, but had "no power to incur any indebtedness other than for current expenses." This agreement continued in force and effect until January 1, 1922, when a new agreement was entered into. This second agreement provided that King was to purchase the interest of Lamb in the copartnership for a sum therein specified payable in monthly installments. It was specifically provided that the execution of this second agreement did not dissolve the copartnership. With reference to the authority of King, it provided that he should "not contract any obligations other than those incident to the copartnership business." It further provided that King was to render to Lamb a monthly statement showing the assets and liabilities of the partnership and of all moneys received and disbursed in the conduct of the business.

The promissory notes in question were executed and delivered subsequent to the execution of the second agreement made between Lamb and King, on January 1, 1922. Lamb had no knowledge of the execution of the promissory notes until March, 1924. In February, 1924, King disappeared and after his disappearance defendant Lamb continued to

conduct the business of the partnership up to and including the time of the trial of this action. At the time each of the notes in controversy was delivered to the respective payees, defendant King received a check equal to the face value of the note. Each of these checks was payable to King & Company and indorsed by King & Company and deposited to the credit of the copartnership in the Bank of California, the depository of the partnership funds of King & Company, with other checks and money in the regular course of business.

If King & Company were a general partnership and the notes were executed by one of the partners in the ordinary course of business, the other partner would be bound, even though he had no knowledge of their execution.

Appellant claims that the copartnership of King & Company was not a commercial and trading partnership, but on the contrary was a noncommercial and nontrading partnership. As to this contention the question arises: Does the distinction between trading and nontrading partnerships apply in California? Appellant has cited us to numerous authorities from other jurisdictions to support this contention; however, the question seems to be one of first impression in this state since the adoption of the codes. Our attention is directed to but two California cases recognizing this distinction, and these were decided prior to the enactment of the code provisions—*Skillman* v. *Lachman*, 23 Cal. 199 [83 Am. Dec. 96], a mining partnership, decided in 1863, and *McConnell* v. *Denver*, 35 Cal. 365 [95 Am. Dec. 107], a ditch company organized to sell water for mines, decided in 1868, and also the following reference: "It is not a trading partnership in which it is presumed that one partner has authority to bind the other in this way," found in *Los Angeles Bank* v. *Wallace*, 101 Cal., at page 481 [36 Pac. 199].

No case has been called to our attention involving a classification of a business similar to that conducted by defendants in this action as trading or nontrading firms. Under modern business conditions it would seem that the business of hauling freight for hire is a commercial business, but when in addition to that we find the partnership engaged in manufacturing and selling boxes for crating merchandise for export shipment, we can but conclude that such a busi-

ness is a trading partnership. If this be so, then under the authorities cited by appellant the defendant King as the managing partner of King & Company had implied authority to execute promissory notes on behalf of the partnership, and as plaintiff gave a valuable consideration for each of the notes herein sued upon and accepted the same as the obligation of King & Company in good faith and without any knowledge or means of knowing that the defendant King was acting beyond the scope of his authority, the jury was justified in returning a verdict for the plaintiff, and the judgment must be affirmed.

The reason that there are no adjudicated cases in this state on this question is apparent. The Civil Code contains a complete statement of the rights, powers and authority of partners between themselves. The distinction between general partnerships and mining partnerships, as laid down in *Skillman* v. *Lachman* and *McConnell* v. *Denver, supra,* is maintained in the code. Thus sections 2511 and 2520, inclusive, of the Civil Code have reference to mining partnerships. Section 2512 provides that an express agreement to become partners or to share the profits and losses of mining is not necessary to the formation or existence of a mining partnership. The relationship arises from the ownership of shares or interests in the mine and working the same for the purpose of extracting minerals therefrom. Section 2516 further provides that a member of a mining partnership may convey his interest in the mining business without dissolving the partnership, and section 2519 provides that no member of a mining partnership or the agent or manager thereof can, by a contract in writing, bind the partnership except by express authority derived from the members thereof.

Thus we see that the distinction between mining partners operating upon shares where one member may dispose of his interest without the consent of the other partners and without dissolving the partnership is carried into our code. Bearing this in mind, we now turn to the sections of the Civil Code with reference to general partnerships, and it is distinctly stated in section 2424 that every partnership other than a special or mining partnership is a general partnership. With reference to the power and authority of partners of a general partnership, every general partner is agent for the partnership in the transaction of its business and has author-

ity to do whatever is necessary to carry on such business in the ordinary manner, and for this purpose may bind his copartners by an agreement in writing (sec. 2429, Civ. Code). In section 2430 are defined the acts which a partner has no implied authority to perform. The execution of negotiable notes is not one of the acts which a partner is by law prohibited from performing on behalf of a general partnership. Section 2431 specifically provides that even acts of a copartner in bad faith towards the other members of a partnership are nevertheless binding on the partnership in favor of persons who have in good faith parted with value in reliance upon such acts. Section 2443 provides that the liability of general partners for each other's acts is defined by the title on agency.

Section 2319 gives an agent authority to do everything necessary or proper and usual in the ordinary course of business for effecting the purpose of his agency and to make a representation respecting any matter of fact not including the terms of his authority, but upon which his right to use his authority depends and the truth of which cannot be determined by the use of reasonable diligence on the part of the person to whom the representation is made.

■ With the adoption of the code in this state the distinction between trading and nontrading partnerships which has been made in other jurisdictions is unnecessary for, with the exception of mining partnerships and special partnerships, all partnerships under the laws of the state of California fall within the same class, and the same rules governing the power and authority apply, whether the partnership is engaged in the business of buying and selling merchandise for profit or engaged in any other business.

In the case of *First National Bank of Dixon* v. *Spangler*, 49 Cal. App. 133 [192 Pac. 874], one of the members of a general copartnership engaged in the butcher business borrowed money from plaintiff upon three promissory notes, all of which were executed by one of the defendants, but the evidence discloses that the partner executing the note represented to plaintiff that the money was to be used for the use and benefit of the copartnership. The trial court found in favor of plaintiff. On appeal the judgment was affirmed with the following observations: "There is no doubt that at the time said obligations were incurred a general partnership

existed between the defendants for the transaction of said business. That every general partner is agent for the partnership in the transaction of its business and has authority to do whatever is necessary to carry on such business in the ordinary manner and for this purpose may bind his copartnership by an agreement in writing (sec. 2429, Civ. Code), if such partner acts within the apparent scope of his authority, whether he acts in good or bad faith, his acts and declarations are binding upon his copartners in favor of third persons, if said third persons believe in and rely upon his statements and upon the strength of such evidence extend credit or advance money to the said partner for the use and benefit of the partnership.''

Appellant points out that in *First National Bank of Dixon* v. *Spangler* the defendants were engaged in the butcher business and that the money for which the notes were given was to purchase cattle to slaughter and that therefore the court found the defendants were general partners. We think under the sections of the code the defendants here, being engaged in the business of draying and box manufacturing, were general partners, and therefore the rule announced in the Spangler case ''that every general partner is agent for the partnership in the transaction of its business and has authority to do whatever is necessary to carry on such business . . . and if such partner acts within the apparent scope of his authority, whether he acts in good or bad faith, his acts and declarations are binding upon the copartners'' has application here, as the act of defendant King in borrowing money for the purposes stated was certainly within the apparent scope of his authority. As to *Los Angeles Bank* v. *Wallace, supra,* wherein appellant quotes the court as saying: ''It is not a trading partnership in which it is presumed that one partner has authority to bind the others in this way,'' it may be said that the sentence quoted is a mere isolated sentence and is not authority that a distinction is recognized in this state between trading and nontrading partnerships. The court clearly used that sentence to distinguish the particular arrangement between the parties in that case from a partnership which is formed for carrying on a business. Its lack of authority on the point to which it is cited is readily seen by reading the paragraph from which the sentence is taken, viz.: ''Had

the bills been drawn simply to obtain money to meet the current expenses of the adventure, it may be conceded that all parties would have been liable, if Wallace had the requisite authority to draw the bills, but no such claims can here be made. *The payee knew of the arrangement between the parties, and the purpose for which bills were drawn.* It was not a trading partnership in which it is presumed that one partner has authority to bind the others in this way. In fact, it was not contemplated by the parties that any such thing should be done. Wallace was merely to expend the funds provided by Babcock and Collins. *He had no authority to incur indebtedness.* Nor can his authority be increased by calling the relation a partnership. The parties fixed by contract their own rights and obligations. They did not call themselves partners. If it be essential to a partnership that one should have the power to bind all by drawing bills of exchange, then this was not a partnership, for Wallace had no such power.'' (Italics ours.) It appears that the arrangement between the so-called partners was not for the conduct of a business; that no one had authority to incur indebtedness; that they did not even consider themselves partners; that the payee of the note had knowledge of the arrangement. In short, the court does not even declare the arrangement a partnership, but points out that, even if it were a partnership, there was an agreement that neither party had the right to incur indebtedness and this fact was known to the payee.

In the present case the negotiations leading up to the execution of the first four notes were conducted by Harry Jacobson, husband of plaintiff, who died in July, 1923. The negotiations leading up to the execution of the last two notes were conducted by Leonard Jacobson, the son of plaintiff. Leonard Jacobson testified that his father had known the defendant King since 1907, and that the witness had a conversation with the defendant King during the late summer or early fall of 1922. King stated to him that he was in need of funds for the business of King & Company, due to the fact that they were expanding and that they had a lot of freight to pay which they had to advance before they could take delivery of the merchandise and a few weeks intervened before they could make collections from their customers. The witness told King that he did not personally

have any funds which he could lend him but suggested that his father had some money on hand which he might be willing to lend him. Defendant King then communicated with the elder Jacobson who agreed to advance $16,000. This money was advanced to King between September 7, 1922, and December 29, 1922, and is represented by four of the promissory notes. About March 31, 1923, defendant King again spoke to the witness about another loan and stated that he was pressed for money; that it was a question of expansion and he had to have funds and asked the witness if he could arrange for more money. After consulting with his father by wire, as the latter was then in the east, he arranged a loan of $4,000, which was obtained from his grandmother, Bertha Kalisky, and a note therefor was executed. In October, 1923, defendant King again stated to the witness that he needed more money, and the witness arranged for a loan in the sum of $4,000.

At the time the last two notes were executed the witness was an employee of King & Company. The witness testified that the defendant King was in active charge of the business during the time of his employment. He met the defendant Lamb occasionally, but Lamb never gave any instructions to any of the employees of the company to his knowledge.

The business conducted by King & Company was primarily that of draying. The witness Jacobson testified that in addition to the drayage business King & Company conducted a boxing plant. He testified: "I know that they manufactured boxes for crating automobiles for persons other than drayage customers. . . . We boxed a lot of automobiles for the General Motors, for the Chevrolet and for the Ford. . . . We did not always do the drayage . . . I went to the boxing plant at least once a month."

Defendant Lamb also testified with reference to the boxing plant conducted by King & Company as follows: "In addition to draying we manufactured boxes for the purpose of crating automobiles and other merchandise for exporting. That part of the business was carried on at 9th and Bryant streets . . . and I think that the rent of the place where we manufactured the boxes was about $400.00 a month."

It will thus be seen that the partnership was engaged in the business of manufacturing boxes for crating automobiles and other merchandise for export, and that this portion of

the business was not inconsequential is evidenced by the fact that the rental of the premises where the boxing plant was operated amounted to $400 a month.

There is substantial evidence in the record from which the jury could have determined and evidently did determine that it was within the ordinary and usual course of the conduct of the business of King & Company to borrow money and executed promissory notes. The following testimony amply supports the verdict of the jury. Defendant Lamb testified that some of the accounts of King & Company were pretty large and involved advancing money for freight; that all draymen have to advance freight; that when a large shipment comes in it runs into considerable money; that he had no idea how much on an average the business had to advance for freight while defendant King was in charge of the business; that he knew that defendant King represented that the firm had to advance large amounts for freight. He also testified that the business borrowed money from the Bank of California. One of the purposes of borrowing money from this source was for the purchase of the season's supply of hay at a time when the market was right and that the defendant King attended to the selection and purchasing of the hay. During the early history of the business defendant Lamb had considerable to do with purchasing of equipment, but as time went on he trusted King more and became less active. Elmer G. Grove, bookkeeper of King & Company, testified that there was an account on the books of King & Company entitled "Notes Payable." On January 1, 1922, there appeared upon the books of the company in this account an aggregate of $10,000, representing notes on the firm for moneys borrowed as follows: To the Bank of California, $5,000; to the Canton Bank, $2,500, and to the South End Warehouse Company, $2,500. The witness then testified from the books and records of the company that the total indebtedness evidenced by promissory notes aggregated at all times at least the sum of $10,000 and that for a very considerable period of time was in excess of $20,000, the highest amount as disclosed by the books being $28,000 on the 1st of January, 1924. Other firms from whom defendant borrowed money and executed promissory notes as disclosed by the books and records of the company during the period when King was borrowing money from

plaintiff were International Harvester Company and the Bank of Italy. All of the obligations shown by the books of the company were paid in the regular course of business, some during the time that defendant King was in charge of the business and some by defendant Lamb after the disappearance of King in February, 1924.

It seems that the nature of the business of King & Company fairly and reasonably implies borrowing of money to accommodate its necessities and convenience whenever the occasion occurs. In *Chumbley* v. *Courtney,* 181 Iowa, 482 [164 N. W. 945], which was an action involving the liability of a purported partnership as well as the individual members thereof on a promissory note executed in the name of the partnership by one of the alleged partners, the supreme court of Iowa says: "The error in each was in assuming that a partner in a nontrading partnership could only be bound by the act of the other in executing a promissory note by attaching the firm name thereto when he has an express order of the other partner so to do. On the contrary, such authority may be implied from the circumstances proven, and in this case the jury might have found from the circumstances proven that, in signing the note, Courtney was authorized by O'Donnell to use the firm name."

It would seem, therefore, on the facts here, even if the distinction between trading and nontrading partnerships were recognized in this state, the same result would obtain.

There is another point presented, and that is: Was express authority conferred upon defendant King? Counsel for appellant in their brief and argument filed assume that no express authority to borrow money and to execute notes on behalf of the partnership as evidence of such indebtedness was so conferred. They state that King had no power to incur any indebtedness other than for current expenses. It is true that under the original articles of copartnership, which were executed on November 1, 1906, defendant King was to manage the business subject to the approval of defendant Lamb, and was to incur no indebtedness other than for current expenses. However, on January 1, 1922, a new agreement was entered into by the terms of which it was agreed that defendant King was to purchase the interest of defendant Lamb for a specified sum, and in which agreement it was specifically stated that it was not to dissolve

the copartnership, and provided that defendant King had the right to contract obligations incident to the copartnership business, defendant King agreeing to hold defendant Lamb harmless for any debts incurred by the copartnership prior to its dissolution.

Appellant urges that the court erred "in not sustaining the objections of defendants Lamb and King & Co. to the introduction of evidence of the acts and declarations of defendant King until after proof by plaintiff that King had authority to bind the partnership, his authority being specifically denied in the answer," and "in sustaining plaintiff's objection to the offering made by the same defendants to prove and show by the books of King & Co. that the moneys placed to the personal credit of defendant King were withdrawn for his personal use, and were not used in the business of King & Co."

The first objection goes merely to the order of proof which must be regulated by the sound discretion of the trial court (Code Civ. Proc., sec. 2042; *Estate of McNamara*, 181 Cal. 82 [183 Pac. 552]; *More* v. *Finger*, 128 Cal. 313 [60 Pac. 933], and such discretion will not be interfered with by a reviewing court unless it has been abused to the substantial detriment of the party complaining (*Bates* v. *Tower*, 103 Cal. 404 [37 Pac. 385]; *Smeland* v. *Renwick*, 50 Cal. App. 565 [196 Pac. 283]).

As to the second objection that the court erred in sustaining the objection of plaintiff to a question asked the witness Elmer G. Grove, the cashier and accountant of King & Company, the record shows the following: "Q. You have stated that certain checks were placed to the personal credit of the defendant King, just state what that record was?"—to which objection was made. Thereupon the defendants Lamb and King & Company stated to the court that if the witness were permitted to answer the question he would testify that the personal account of the defendant King was kept by the witness by direction of King, and that the items concerning which the witness has testified as having been entered to the personal credit of the defendant King were entered by the witness in that account by direction of defendant King to be charged to him personally, and that all of the sums so charged to defendant King were drawn by the defendant for his own

personal use, and that none of it was in the partnership business. The court sustained the objection. We cannot see how appellant was prejudiced by the court's sustaining this objection. The money received by defendant King from respondent and her assignor was deposited in the account of King & Company in the Bank of California along with other moneys received by the partnership in the ordinary course of business. It is conceded that authority was conferred upon King by his copartner Lamb to draw on the partnership funds at all times. Assuming that the books of the partnership disclosed that upon the same day certain of these deposits were made, defendant King's personal account was credited with an equivalent amount and that at the time of his disappearance King had overdrawn his personal account, it would in no way indicate that the partnership did not receive the benefit of the money obtained from respondent and deposited in its account. Whether defendant King misappropriated funds of the partnership or overdrew his account was no concern of respondent, nor can she be bound by the entries made in the books of King & Company, of which she had no knowledge or over which she had no control.

Appellant claims error committed by the court in giving certain instructions, as follows: In instruction XV, "that King in dealing with third persons, such as the plaintiff in the action, acted as the agent of King & Co. and also George W. Lamb, his partner." This instruction is claimed erroneous in that it failed to point out that such agency could only exist when King was acting within the scope of the business of King & Company. Instruction XVI, "that King as a general partner represented King & Co. and Lamb the other partner in all his dealings with third persons." Appellant here complains that the instruction should have limited such agency to those dealings necessary or proper and usual in the ordinary course of business of King & Company. Instruction XVIII in not limiting the agency to acting within the scope of his actual or ostensible authority instead of apparent scope of his authority: this objection may be answered in the language of the court in *First National Bank of Dixon* v. *Spangler, supra,* "if such partner acts within the apparent scope of his authority, whether he acts in good or bad faith, his acts and declarations are bind-

ing upon his copartners in favor of third persons.'' Instruction XIX is claimed to be misleading in stating ''actual authority is such as a principal intentionally or by want of ordinary care allows an agent to believe himself to possess.'' Instruction XX is also claimed to be misleading in stating ''to effect the purpose of his principal,'' instead of making use of the language of section 2319 of the Civil Code ''for effecting the purpose of his agency''; and instruction XXII—''A general partner represents a partnership and his other general partners for all purposes within the scope of his actual or ostensible authority'' (Civ. Code, sec. 2330). This is claimed erroneous in failing to call attention to or limit such application to the requirements of section 2429 of the Civil Code ''in the transaction of its business, and has authority to do whatever is necessary to carry on such business in the ordinary manner.''

Elsewhere in its instructions the court instructed the jury: ''One general partner is deemed to be the agent of the other general partners and each is liable for the acts of the other within the scope of his authority. . . . An agency is either actual or ostensible when the principal intentionally or by want of ordinary care causes third persons to believe another his agent who is not really employed by him. . . . If you find that J. Charles King, in executing the promissory note which is the subject matter of this action in the name of King & Co. acted within the apparent scope of his authority, whether he acted in good or bad faith, his acts and declarations are binding upon his copartner in favor of plaintiff herein, if the said plaintiff believed in and relied upon his statements as to the purpose for which said promissory notes were executed, and upon the strength of said confidence agreed to advance money to the said J. Charles King for the use and benefit of the partnership of King & Co.''

Appellant's principal objection to the instructions is not so much that they do not contain correct statements of the law, but that certain additions should have been made to limit the application of the principles involved. Taking the charge as a whole the instructions cover the principles of law necessary to the jury's understanding of the issues and contain the limitations claimed to be omitted in the instructions complained of. Furthermore, appellant did not propose any instructions for submission to the jury.

If appellant desired any particular instructions given which he deemed were necessary to a correct understanding by the jury of his theory of the case, it was his privilege and duty to request them, and he cannot now complain of the failure of the court to give instructions which it was his right to prepare and propose to the court for submission to the jury.

The judgment is affirmed.

Knight, J., and Cashin, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 28, 1928.

All the Justices present concurred.